**UNITED STATES of America, Plaintiff,**

v.

**ALLEGAN METAL FINISHING COMPANY, Defendant.**

**No. K86–441–CA4.**

United States District Court
W.D. Michigan.

June 6, 1988.

Gordon G. Stoner, Environmental Enforcement Section Land and Natural Resources Div., U.S. Dept. of Justice, and Roger J. Marzulla, Asst. Atty. Gen., Washington, D.C., for plaintiff.

Charles M. Denton and Theresa M. Poulton of Varnum, Riddering, Schmidt & Howlett, Grand Rapids, Mich., for defendant.

## OPINION

ENSLEN, District Judge.

Plaintiff United States of America ("plaintiff") brings this action pursuant to provisions of the federal Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. § 6901, *et seq.* and invokes jurisdiction pursuant to 42 U.S.C. § 6928(a) and 28 U.S.C. §§ 1331, 1345 and 1355. Presently before me is defendant Allegan Metal Finishing Company's ("defendant" or "Allegan") motion for immediate consideration of certain threshold liability issues which were previously set forth in the parties' cross-motions for summary judgment. The cross-motions for summary judgment address defendant's alleged RCRA liability with respect to two "holding ponds" which process wastewaters that were discharged from Allegan's metal finishing facility. Also pending are several motions in limine brought by both plaintiff and defendant, and defendant's appeal from the Magistrate's order of May 27, 1988.

Allegan, a Michigan corporation, has operated its Michigan facility since 1959. Allegan performs its electroplating process for a variety of industries including the automobile and appliance industries. As a part of its electroplating process, Allegan produces various wastewaters as by-products including zinc-cyanide, zinc-chloride, chromate and acid and alkali rinses. Allegan's wastewater treatments system, as of November 18, 1980, and prior to the use of its current wastewater treatment plan, included separate chemical treatment of wastewater from the zinc electroplating process and of wastewater from all rinses and related chromate post-treatments. After this separate chemical treatment, the treated wastewaters were then combined and treated physically. Since 1972, Allegan has maintained the two holding ponds at issue here on a parcel of property which is situated between its manufacturing site and the Kalamazoo River. *See Facts Not in Dispute* ("FND") at ¶¶ 4–7 attached to Pre-Trial Order.

It is also undisputed that Allegan began using its two holding ponds pursuant to a 1972 State of Michigan Stipulation No. V-00250. Until October 1987, Allegan discharged wastewaters, treated according to the process described above, from its Allegan, Michigan facility into the two holding ponds. This discharge is characterized by the U.S. Environmental Protection Agency ("EPA") as wastewater treatment sludges from electroplating operations designated by the EPA as listed hazardous waste F006 pursuant to RCRA regulations described at 40 C.F.R. Part 261, Subpart D. *Id.* at ¶¶ 8–10.

These holding ponds act as "large sand filters" through which the treated wastewaters pass. Treated precipitated solids are allowed to collect within the ponds and are characterized as "sludge." At the end of 1985, Allegan was generating approximately 0.25 tons of ("dried") sludge per day. Until approximately 1981, Allegan periodically dredged the sludge from the ponds and placed it on the banks of the ponds to dry. Allegan would then have the sludge transported to a properly licensed off-site disposal facility. Allegan last transported such sludges from the ponds in 1983. *Id.* at ¶¶ 9–13.

Allegan's own analysis of the sludge indicates that the sludge in each pond contains levels of chromium in excess of the EPA's regulatory requirements set forth in 40

C.F.R. Part 261, Subpart C, for chromium. On June 23, 1986, however, Allegan did submit a delisting petition which seeks to have the sludge delisted because, Allegan argues, after treatment with lime, it should not be defined as hazardous. As of April, 1988, the EPA has not taken final action on Allegan's delisting petition. *Id.* ¶¶ 14–16.

On June 23, 1980, Allegan submitted to the EPA a notification of hazardous waste activity identifying F006 as a waste by-product which was generated at the Allegan facility. On November 15, 1982, Allegan submitted to the EPA an amended notification of hazardous waste activity which identified waste F008 and deleted waste F006 as waste generated by Allegan. *Id.* at ¶¶ 17–18.

On December 10, 1984, the EPA issued to Allegan an administrative complaint pursuant to § 3008 of RCRA, 42 U.S.C. § 6928. The administrative complaint alleged that Allegan failed to comply with the RCRA permitting requirements and interim status standards for the holding ponds. It is apparently now undisputed that Allegan submitted a RCRA Part A interim status permit application for the ponds on February 21, 1985 and that the EPA accepted the application as if timely filed. Further, in its memorandum in response to defendant's reply brief in opposition to its motion for partial summary judgment, plaintiff asserts that the issue of whether defendant has interim status at all is not an issue in this case because the Allegan facility failed to comply with section 3005(e) in order to maintain authority to operate. *See* United States's Memorandum in Response to Defendant's Reply Brief in Opposition at 2, ¶ 2. That Part A permit application, however, identifies wastes F006 and F008 as generated at the Allegan facility. *Id.* at ¶ 20.

The EPA and Allegan settled the RCRA claims at issue in the administrative complaint by entering into a Consent Agreement and Final Order ("CAFO") entered by the EPA Regional Administrator on June 28, 1985. On May 15, 1985, Allegan submitted a contingency plan to EPA and the Michigan Department of Natural Resources ("MDNR"). That plan was revised for EPA and MDNR approval on June 15, 1985. On April 5, 1985, Allegan submitted its Closure Plan for the holding ponds to the EPA. On August 2, 1985, the EPA requested certain changes and revisions which were to be submitted by August 31, 1985. On August 29, 1985, the revisions to the Closure Plan were submitted by Allegan to the EPA. On September 27, 1985, the EPA approved Allegan's Closure Plan pursuant to further revisions as defined by the EPA. *Id.* at ¶¶ 21–23.

On August 15, 1985, Allegan submitted to the EPA satisfactory hazardous waste personnel training records. On April 23, 1985, Allegan submitted to the EPA a groundwater assessment plan. On July 26, 1985, the EPA requested revisions of that plan and on August 29, 1985, the groundwater assessment plan was revised and resubmitted by Allegan. On September 20, 1985, the EPA responded to Allegan's groundwater assessment plan revisions, and on November 11, 1985 Allegan submitted further revisions of the groundwater plan. On December 20, 1985, the U.S. responded to the November 11, 1985 revised groundwater assessment plan. Finally, on January 20, 1986, the EPA approved Allegan's revised groundwater assessment plan. *Id.* at ¶¶ 24–25.

On January 31, 1986, Allegan submitted to the EPA an irrevocable letter of credit with standby trust which satisfied the RCRA financial assurance for closure requirements. It is undisputed that Allegan has not demonstrated that it has obtained insurance for bodily injury and personal damage to third-parties caused by non-sudden accidental occurrences arising from the operation of the holding ponds. On April 29, 1985, Allegan submitted to the EPA documents from The Graham Company concerning the availability of liability insurance for non-sudden accidental pollution occurrences. *Id.* at ¶¶ 26–27.

On January 28, 1986, Allegan submitted a check to the EPA in the reduced civil penalty amount of $3,000. The check was cashed and endorsed by the EPA. In 1981, Allegan submitted an National Pollutant

Discharge Elimination System ("NPDES") wastewater discharge permit application to the MDNR. The permit application was approved by MDNR and permit No. MI 0042772 was issued on November 2, 1982. *Id.* at ¶¶ 28–29.

Finally, on October 16, 1986, the EPA published notice of the State of Michigan's final authorization to administer the Michigan Hazardous Waste Management Act (1979 P.A. 64) under RCRA § 3006 at 51 *Fed.Reg.* at 36804. The State of Michigan was granted final RCRA authorization by the EPA effective October 30, 1986, the day this suit was filed.

*Standard*

It is axiomatic that summary judgment is appropriate whenever issues can be resolved as a matter of law and there is "no genuine issue as to any material fact." *See* Rule 56(c) of the Federal Rules of Civil Procedure. The standards for granting the motion in the Sixth Circuit are well known and there is no need to repeat them here. Further, in recent years a number of Supreme Court decisions can be read to have encouraged lower courts to use the summary judgment device more liberally. *Cf. Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *see also Berb v. First American Bankshares, Inc.*, 796 F.2d 489, 496–97 (D.C.Cir.1986).

*Discussion*

*The "Threshold Issues"*

■ Defendant first argues that RCRA applies only to "solid waste." *See* 42 U.S.C. §§ 6902 & 6903. Defendant argues that under § 1004(27) of RCRA the term "solid waste" does not include "solid or dissolved materials in ... industrial discharges which are point sources subject to permits under section 402 of the Federal Water Pollution Control Act, as amended (86 Stat. 880) ..." 42 U.S.C. § 6903(27). Plaintiff claims, however, that *the wastewaters discharged into defendant's holding ponds constitute "solid waste"* which is further character-

ized as "hazardous" under RCRA. Complaint at ¶ 15.

Defendant asserts that the wastewater discharged by it to the holding ponds at issue here has at all relevant times been subject to regulation by the State of Michigan Water Resources Commission under wastewater discharge permits. Defendant asserts further that in 1972 it was permitted to discharge this treated wastewater to the holding ponds pursuant to a Michigan Water Resources Commission Stipulation. *See* Copy attached to Defendant's Memorandum in Support. In 1982, defendant argues, pursuant to the National Pollutant Discharge Elimination System ("NPDES") program under § 402 of the Federal Water Pollution Control Act (33 U.S.C. § 1342), and the federally authorized State permit system administered under the Michigan Water Resources Commission Act Rules, Part 21 (1979 Administrative code R 323.-2101–2160), it was issued a discharge permit which superseded the 1972 stipulation. *See* Permit No. MI 0042772 attached to Defendant's Memorandum in Support. Finally, defendant asserts that the 1982 NPDES permit required upgrading defendant's wastewater treatment system for discharge to the surface water, and then closure of the holding ponds which would be bypassed by the NPDES discharge.

In sum, defendant is arguing that it is the NPDES regulatory scheme rather than the RCRA program which controls the wastewater discharge which, defendant asserts, is at issue here. Defendant concludes that based upon the NPDES permit regulation, defendant's wastewater discharge to the holding ponds at issue is not "solid waste" regulated under RCRA and that plaintiff's complaint must therefore be dismissed.

I note that defendant first raised this "defense" in its reply brief to plaintiff's motion for partial summary judgment. Nevertheless, plaintiff has responded to defendant's argument in its response to defendant's motion for immediate consideration. Plaintiff argues that defendant's reading and application of the definition of

"solid waste" is flawed. I agree. The definition of "solid waste" provides in pertinent part:

> The term "solid waste" means any garbage, refuse, sludge from a waste supply treatment plant, or air pollution control facility and other discarded material, including solid, liquid, semisolid, or contained gaseous material resulting from industrial, commercial, mining, and agricultural operations, and from community activities, *but does not include ... industrial discharges which are point sources subject to permits under section* 1342 of Title 33 ...

Section 1004(27) of RCRA, 42 U.S.C. § 6903 (emphasis added).

It is clear that the exclusion enshrined in the definition of solid waste is for those *actual discharges from point sources* which are made pursuant to and authorized by a NPDES permit. Further, the regulation that defines "solid waste" states that "[t]his exclusion applies only to the *actual permit discharges.*" 40 C.F.R. § 261.4(2) (emphasis added).

It is also clear that defendant was not authorized and in fact, did not discharge wastewater from its facility pursuant to a NPDES permit until October 1987. Further, defendant was issued a NPDES permit October 1982. The permit required defendant to construct a wastewater treatment system which was to be operational by 1984. Defendant thus had no permit to discharge wastewater from its facility into the Kalamazoo River until the wastewater treatment was operational. It was not until late 1987 that defendant started actually discharging wastewater pursuant to that permit. Prior to October 1987, it appears that defendant discharged wastewater from its facility to the two on-site holding ponds at issue here. Accordingly, I find no merit in defendant's argument that a NPDES permit—which did not authorize discharges into the Kalamazoo River until October 1987—somehow precludes RCRA regulation with respect to the disposal of hazardous waste to its on-site ponds that occurred continuously from 1980 until October 1987. This is especially so in the face

of the above-cited "Comment" attached to the regulation defining solid waste exclusions. *See* 40 C.F.R. § 261.4(2).

Moreover, I am persuaded by plaintiff's argument that even allowing that defendant has discharged wastewater from its facility since October 1987 *under the NPDES permit,* that facility is nevertheless still subject to regulation under RCRA to the extent that the facility generates, treats and stores hazardous waste. Plaintiff points out that the regulation that defines solid waste based on discharges pursuant to a NPDES permit states that "[t]his exclusion ... does *not* exclude industrial wastewaters while they are being collected, stored or treated before discharge, *nor does it exclude sludges that are generated by industrial wastewater treatment.*" 40 C.F.R. § 261.4(2) (emphasis added). It is clear that the pond sludge at issue here falls into the latter category.

■ I am also not persuaded by defendant's second argument that section 3005(j) of RCRA rather than section 3005(e)(2) is controlling and that section 3005(j) authorizes defendant to discharge hazardous wastes to its on-site impoundments until November 1988. I believe that section 3005(j) sets forth the conditions that a facility is required to meet in order to *continue* to use a surface impoundment which is already in existence on November 4, 1984, *after* November 8, 1984. I agree with the plaintiff that section 3005(j) contains a requirement that a facility must first qualify for authorization to operate under subsection (e), that is, that it must have fully complied with the requirements of section 3005(e)(2) or to otherwise have a final RCRA permit in order to continue to operate as a surface impoundment. Section 3005(j) provides in pertinent part:

> (1) Except as provided in paragraph (2), (3), or (4), each *surface impoundment in existence on November 8, 1984, and qualifying for authorization to operate under subsection (e) of this section* shall not receive, store, or treat hazardous waste after the date four years after November 8, 1984 ... (emphasis added)

I also find it curious that defendant now argues that its "holding ponds ... are more properly characterized as 'surface impoundments,' the definition of which expressly includes holding ponds" (Defendant's Motion for Immediate Consideration at 4–5), when it previously denied plaintiff's Request to Admit which states: "Allegan's on-site holding ponds are 'surface impoundments' within the meaning of 40 C.F.R. § 261.10." Defendant's Response to Plaintiff's Request to Admit ¶ 11. In any event, I reject defendant's argument that there can be no automatic loss of interim status ("LOIS") for these holding ponds until November 8, 1988.

■ Finally, defendant argues that the United States has failed to comply with section 3008(a)(2) of RCRA, 42 U.S.C. § 6928 which requires that the EPA notify a state of the filing of a civil action under section 3008(a)(1). Section 3008(a)(2) states in pertinent part:

> In the case of a violation of any requirement of this subchapter where such violation occurs in a State which is authorized to carry out a hazardous waste program under section 6926 of this title, the Administrator shall give notice to the State in which such violation has occurred prior to issuing an order or commencing a civil action under this section.

Plaintiff argues that section 3008(a)(2) is inapplicable because violations of section 3005(e)(2) occurred before the State of Michigan was authorized to carry out its RCRA program. Once a state receives authorization to implement its own statutory scheme with respect to hazardous waste "in lieu of the federal program," it is clear that Congress intended that the EPA retain independent enforcement authority. *Cf.* 5 U.S.Code Cong. & Admin.News at 6238, 6299 (1976). Here, plaintiff brings this action seeking relief for violations of its CAFO and violations prior to Michigan's receiving its final authority. Moreover, plaintiff argues that the violations claimed by the United States first occurred in late 1985 and are continuing and that although the State of Michigan received authorization for its RCRA program on October 30,

1986, the complaint in this case was filed on the same day, October 30, 1986.

In the alternative, plaintiff argues that even assuming 3008(a)(2) is applicable, the United States would establish through testimony at trial that it complied with the requirements of section 3008(a)(2). Therefore, even assuming that the plaintiff was required to notify the State of Michigan, all that is required is that the EPA first notify the State of its intent. In paragraph 34 of its complaint, plaintiff alleges that it did notify the State of Michigan thereby complying with section 3008(a)(2). I note that the recent Ninth Circuit case, *Hallstrom v. Tillamook County,* 844 F.2d 598 (1987) which defendant attached to its trial brief is inapposite in that the jurisdictional 60–day notice requirement of RCRA discussed therein is only applicable to a *citizen suit* under RCRA—the policy concerns of citizen enforcement provisions are not relevant to an enforcement proceeding brought by the U.S. Government.

I find that section 3008(a)(2) is not applicable here in that the violations at issue occurred prior to Michigan's authorization and because it appears that the complaint was filed on the *same day* that Michigan received its authorization.

*The Cross–motions for summary judgment*

On December 4, 1984, the EPA filed an administrative complaint alleging various violations of RCRA. On May 20, 1985, Allegan signed a Consent Agreement and Final Order ("CAFO") in settlement of that EPA administrative action. *See* Ex.C. Defendant's Response to Plaintiff's First Set of Requests for Admissions of Fact at 13–14.

It first appeared to me—after reading all the briefs and numerous supporting documents submitted in this case—that there has been no "new" RCRA violation *which presents an immediate and substantial threat to human health or the environment* such as to support the bringing of this present action in the face of the signed CAFO and the events that have transpired since then. Further, the U.S. EPA administrative complaint and CAFO also appear,

to some extent, to address the same permitting and interim status issues which are the subject of this litigation. In settlement of the prior EPA administrative proceeding, defendant alleges that it filed a part A permit application and was deemed to have timely achieved interim status. Moreover, defendant argues that it *complied* with the RCRA groundwater monitoring and financial assurance requirements under the CAFO to continue the permitted status and that it is in compliance with the U.S. EPA–approved closure plan. Upon closer analysis and reflection, I believe that government may bring the present action.

Defendant admits that the administrative complaint issued to Allegan by the EPA pursuant to section 3008(a)(1) of RCRA 42 U.S.C. § 6928 on December 10, 1984, alleged that Allegan had failed to comply with the RCRA permitting requirements and the interim status standards. Defendant further asserts that "[o]n June 28, 1985, EPA and Allegan settled the administrative complaint by entering into a Consent Agreement and Final Order." United States's Memorandum in Support of Motion for Partial Summary Judgment at 7. Moreover, defendant concedes that the CAFO required Allegan *to achieve and maintain compliance* with all the requirements for the treatment, storage, or disposal of hazardous waste as set forth in 40 C.F.R. Part 265. The CAFO specifically required that Allegan submit to the EPA documentation of financial assurance for closure as required by 40 C.F.R. § 265.143 within 45 days of entry of the CAFO. The CAFO also required Allegan to provide documentation that it possessed liability insurance for sudden and non-sudden accidental occurrences as required by 40 C.F.R. § 265.147(a) and (b). *See Id.* at 7–8. I find it significant that the CAFO itself provided that the EPA *may* stay the "insurance requirement" *provided the defendant is able to document that, despite diligent effort, it was unable to secure liability insurance. See* Complaint at ¶ 23.

Defendant argues that its "compliance" with the CAFO is properly characterized as an accord and satisfaction and/or *res judicata* with respect to defendant's motion for summary judgment. For example, defendant asserts that the CAFO provides for payment of the mitigated civil penalty of $3,000 in lieu of the $16,000 civil penalty and that the Government accepted its payment of $3,000 which works an accord and satisfaction. *See* CAFO at ¶ 5.

Because defendant has not satisfied all the requirements of the CAFO in a timely manner, plaintiff has brought an action to enforce the CAFO. Complaint at ¶¶ 1 & 2; *see also* Theory of Notice and Claim attached to Pre–Trial Order. Moreover, plaintiff alleges that defendant is presently in violation of RCRA. To some extent, then, the "present" violation is rooted in the unsatisfied contingent terms of the CAFO—which were in turn based upon allegations in the administrative complaint. Plaintiff asserts that defendant failed to comply with the terms of the CAFO in a timely manner. Defendant argues that it did comply with the CAFO and that the CAFO itself precludes the plaintiff's present RCRA action. Although plaintiff seeks injunctive relief and civil penalties pursuant to RCRA (*see* Complaint at ¶¶ 1, 2, & 30), its present motion for partial summary judgment seeks only a determination of liability.

*Plaintiff's First Claim for Relief*

 Plaintiff's first claim for relief alleges that defendant is liable under § 3008(a) of RCRA for violation of the permitting requirements of § 3005(a) and (e) of RCRA, 42 U.S.C. § 6925(a) and (e). The first claim for relief provides:

> Defendant possesses neither a RCRA permit nor interim status for the Allegan facility. Under Section 3005(a) and (e) of RCRA, 42 U.S.C. § 6925(a) and (3), defendant's further operation of the Allegan facility without complying with RCRA's permitting and interim status requirements is prohibited.

Defendant's liability for violations of § 3005(a) and (e) can be established either by proving that defendant did not achieve interim status on November 18, 1980, or, in the alternative, even if defendant is construed to have met the requirements for

interim status, it lost that status on November 8, 1985 when it *failed to certify compliance* with the financial assurance requirements. Plaintiff concludes that because defendant never received "interim status," pursuant to § 3005 of RCRA, defendant was in violation of the RCRA permitting and/or interim status requirements since November 19, 1980. Plaintiff further asserts that defendant failed to certify that its facility was in compliance with all the applicable financial responsibility requirements *by November 8, 1985.*

Plaintiff concludes that as a result of these deficiencies, defendant was required to cease operating its land disposal facility but that Allegan continued to use them after November 8, 1985. *See* Dep. of Walter Sosnowski (testifying that Allegan continued to discharge its wastewaters into on-site holding ponds until Allegan had completed construction of a new wastewater treatment system in September of 1987). The plaintiff further concludes that its has established all the elements necessary to establish a violation of § 3005(a) and (e).

1) defendant was the owner or operator of a hazardous waste land disposal facility;

2) defendant had neither a permit nor interim status;

3) defendant failed to certify compliance or comply with the requirements of § 3005(e)(2); and

4) defendant operated the facility without a permit and without the benefit of "interim status" beyond the November 8, 1985, cut-off date.

Defendant argues that the original administrative complaint which was settled by the CAFO relates the same RCRA claims which are at issue here. Specifically, defendant asserts that the present complaint again alleges a violation of the "interim status" permit requirements of RCRA because a part A permit application was not filed by November 19, 1980. Complaint at ¶ 18.

It is true that the administrative complaint filed December 4, 1984 alleged a number of violations of the RCRA interim status permit requirements for waste facilities including: a) general inspection requirements; b) personnel training; c) contingency plan; d) groundwater monitoring; e) closure plan; f) closure cost estimates; g) financial assurance for closure; and h) insurance for environmental liability. However, defendant's contention that all of the alleged violations were [finally] settled by the parties and confirmed in the administrative CAFO, that is, that the prior proceedings which culminated in the entry of the CAFO bars the relitigation of all of those claims is not persuasive. First, it appears from the face of the CAFO when measured against the stipulated facts that *defendant did not timely comply with all the provisions of the CAFO.* More important, for the purposes of plaintiff's first claim for relief is the fact that the RCRA amendments of 1984 added § 6925(e)(2) which "terminates interim status for land disposal facilities on November 8, 1985 unless those facilities submit Part B permit applications *and* certify compliance with the applicable groundwater monitoring and financial responsibility requirements." *Vineland Chemical Co. v. United States E.P.A.*, 810 F.2d 402, 408 (3d Cir.1987).

Plaintiff argues that there is nothing in the language of the CAFO to suggest that it operates prospectively or that it permits operation of the Allegan facility beyond the November 8, 1985 RCRA cut-off date. Plaintiff emphasizes that the administrative complaint was issued by the EPA on December 4, 1984 and that the CAFO was entered June 28, 1985.

Put differently, plaintiff is arguing that even assuming defendant had interim status based upon the *nunc pro tunc* validation of its late filing of Permit A via the entering of the CAFO (*see also* Stipulated Facts at 4, ¶ 20), the alleged "interim status" was "automatically" lost on November 8, 1985 because Allegan did not timely submit its Part B permit application *and* did not certify compliance with the applicable groundwater monitoring and financial responsibility requirements. *See e.g., U.S. v. Conservation Chemical Co. of Illinois*, 660 F.Supp. 1236, 1237–1238 n. 3 (N.D.Ind.

1987) (explaining in detail the history of RCRA and discussing the proper application of the 1984 amendments).

I agree with plaintiff that defendant's *res judicata* and accord and satisfaction defense is irrelevant to its first claim for relief based upon defendant's failure to meet the certification requirements of section 3005(e)(2) of RCRA by November 8, 1985. *See* United State's in Opposition of Defendant's Motion for Summary Judgment at 4–5.

I am not wholly unsympathetic to defendant's arguments that it was commercially impracticable to fulfill the financial responsibility requirements by November 8, 1985. However, it appears to me that it was the intent of Congress that interim status cannot be maintained beyond November 8, 1985 unless an operator *certifies* compliance with the financial responsibility requirements by that date. Moreover, it is clear that an "operator cannot certify compliance if the facility is not actually in compliance." *Vineland*, 810 F.2d at 409 n. 4 (3d Cir.1987). (I also observe that while Allegan originally submitted to the U.S.A. a groundwater assessment plan of April 23, 1985, Allegan's revised groundwater assessment plan was not approved by the U.S. EPA until January 20, 1986).

Moreover, I also find persuasive plaintiff's argument that a Federal Register notice dated August 21, 1985 outlined the problems the industry was experiencing in obtaining insurance for sudden *and* non-sudden releases and requested comment on whether the financial responsibility regulations ought to be modified. *See* Fed.Reg. 33902 (August 21, 1985). In that notice, the EPA stated that it had adopted a short term enforcement policy which allowed that certain owners or operators who did not have the required insurance could be placed on a compliance scheduled for obtaining such insurance. *Id.* at 33907. Plaintiff argues that it was precisely this action which it took with respect to Allegan in the CAFO. Still, the EPA specifically noted that *"[t]he policy does not apply after November 8, 1985, and will not (as presently stated) affect the requirement*

*that interim status facilities certify compliance with the financial responsibility requirements of that date." Id.* (emphasis added).

Finally, it appears that on September 25, 1985, EPA issued another release which reiterated its position with respect to the financial responsibility requirement of obtaining insurance by November 8, 1985. That EPA release noted:

All owner/operators of land disposal facilities or units that do not ... certify compliance with all applicable ground-water monitoring and financial requirements, must comply with all applicable closure and post-closure requirements as specified in 40 C.F.R. Part 265 Subpart G or the equivalent State requirement, as applicable, and must stop introducing wastes into facilities or units not retaining interim status on and after November 8, 1985.

Accordingly, defendant was on notice that it must either obtain the necessary insurance coverage or comply with the closure requirements and stop introducing wastes into its on-site holding ponds. It also appears that on July 11, 1986, the EPA issued a new rule which modified the financial responsibility requirements by allowing the use of a corporate guarantee to satisfy, apparently, the requirement of financial assurance for closure of the facility. 51 Fed. Reg. 25950 (July 11, 1986). However, the EPA apparently made no additional modifications, but rather after reviewing comments from the industry and the public, chose to retain the liability insurance requirements.

I agree with plaintiff that Allegan's "impossibility" contractual defense is analogous to the assertion—in the context of enforcement actions under the Clean Air Act—that a regulatory requirement is technologically or economically infeasible. In Clean Air Act enforcement actions, courts have clearly held that claims that a regulatory requirement is economically or technologically infeasible are only relevant to the relief which a court will grant and not to the issue of whether the Clean Water Act itself has been violated. *See e.g. Friends*

of the Earth v. Potomac Electric Power Co., 419 F.Supp. 528, 535 (D.D.C.1976); see also United States v. Ford Motor Co., 814 F.2d 1099, 1103–1104 (6th Cir.1987).

I will now discuss further the four specific elements which must be established in order to make out a violation of section 3005(a) & (e).

### 1) Defendant is an operator of a hazardous waste facility

Defendant's admissions establish that defendant is the owner or operator of a facility which produces wastewaters which are hazardous wastes. See Admissions ¶¶ 3–5 & 14 see also FND ¶ 10; see also Stipulation 2 of the CAFO. Moreover, defendant's own waste analysis indicates that its ponds contain "characteristic" hazardous wastes in that they contain levels of chromium in excess of the EPA regulatory requirements. See Appendix B of Defendant's Contingency Plan and Emergency Procedures Report, attached to Plaintiff's Motion as Ex. E.

### 2) Defendant's facility is a land disposal facility

■ It is true that the term "land disposal facility" is undefined in RCRA or in the corresponding regulations. Still, "land disposal" is defined by RCRA to include "any placement of such hazardous waste in a surface impoundment." Plaintiff argues that a surface impoundment in which a hazardous waste is placed is thus a "land disposal facility." Plaintiff concludes that any surface impoundment at the Allegan facility in which hazardous waste was placed is a land disposal facility within the meaning of the statute. RCRA section 3004(k). It is well settled that an agency interpretation of a statute is entitled to great deference by the officers or agency which is charged with its administration. Chevron, U.S.A., Inc. v. NRDC, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984); see also McCown v. Secretary of HHS, 796 F.2d 151, 157 (6th Cir.1986).

I reject defendant's argument that the term "land disposal facility" used in section 3005(e)(2) of RCRA is constrained by the regulatory definition of "disposal facility" found at 40 C.F.R. § 261.10. The regulatory definition limits a "disposal facility" to a location where hazardous waste is "intentionally placed" and will remain after closure. Plaintiff argues that this definition is at odds with the broad definition of "land disposal" and "disposal" contained in the statute and that it is the statutory definition which must control. "Disposal" in § 1004(3) of RCRA is defined to include:

the discharge, deposit, injection, dumping, spilling, leaking, or placing of any solid waste or hazardous waste into or on any land or water so that such solid waste or hazardous waste or any constituent thereof may enter the environment or be emitted to the air or discharged into any waters, including groundwater.

42 U.S.C. § 6903(3).

Further, "surface impoundment" is defined as:

a facility or part of a facility which is a natural topographic depression, man-made excavation, or diked area formed primarily of earthen materials (although it may be lined with man-made materials), which is designed to hold an accumulation of liquid wastes or wastes containing free liquids, and which is not any injection well. Examples of surface impoundments are holding, storage, settling, and aeration pits, ponds, and lagoons.

40 C.F.R. § 260.10.

The statutory definition of "land disposal" appears to me to include "any placement" in a surface impoundment—whether or not the material is intended to remain there after the facility is closed. To adopt defendant's definition would appear to frustrate the intent of Congress in enacting section 3005(e)(2). It is clear that the intent of Congress was to ensure that all facilities where hazardous wastes are placed on the ground—and for that reason threaten to contaminate the groundwater—have a groundwater monitoring program and will make assurance of financial capability to remedy environmental damage. It is a tough statute designed to address potentially life-threatening problems. United

*States v. T & S Brass and Bronze Works, Inc.,* 681 F.Supp. 314 (D.S.C.1988) involved the discharge of hazardous waste F006 to on-site ponds and addressed the issue of the proper definition of "land disposal." The *T & S Brass* court said:

Section 3005(e) of RCRA clearly applies to land disposal facilities. The EPA interprets the term "land disposal facilities" to encompass the following types of facilities: landfills; land treatment units; *surface impoundments for disposal, treatment, or storage;* waste piles and Class I hazardous waste underground injection wells. (footnote omitted).

Although RCRA does not define "land disposal facility," Congress did provide a definition of "land disposal." RCRA § 3004(K) provides that the term " 'land disposal,' when used with respect to a specified hazardous waste in a landfill, shall be deemed to include, but not be limited to, any placement of such hazardous waste in a landfill, *surface impoundment,* waste pile, injection well, land treatment facility, salt dome formation, salt bed formation, or underground mine or cave." 42 U.S.C. § 6924(K) (emphasis added). Thus EPA's interpretation is consistent with the statute and is reasonable. Moreover, both definitions include the term "surface impoundment." 42 U.S.C. § 6901(b)(7).

*T & S Brass, supra,* at 320.

In the alternative, the *T & S Brass* found that based on the facts before it, even under the terms of the definition of "disposal facility" set forth at 40 C.F.R. § 260.10, T & S Brass would be considered a disposal facility in that it intentionally placed hazardous waste F006 into its surface impoundments and hazardous constituents will remain at the site after closure. 40 C.F.R. 260.10 defines a "disposal facility" as follows:

a facility or part of a facility at which hazardous waste is intentionally placed into or on the land or water, and at which hazardous waste will remain after closure.

Here, defendant argues that while it intended to place its wastewaters in the hold-ing ponds, it did so "without the knowledge or understanding that they would subsequently be characterized as 'hazardous' and certainly with no intent that they would remain in the ponds after closure." Defendant's Supplemental Brief at 6 n. 4. Defendant argues further that its EPA-approved closure plan is characterized as a "clean-close" which apparently means that the wastes in the ponds are to be completely excavated and transported off-site for disposal. *Id.* at 7 n. 4.

■ I simply cannot accept defendant's crabbed definition of "land disposal facility" drawn from the regulatory definition of "disposal facility" found at 40 C.F.R. § 261.10. Again, such a definition would defeat the intent of section 3005 and would also conflict with the *statutory* definitions of "land disposal" and "disposal." Nor will I read into the statute some "state of mind" requirement as to whether the waste and/or wastewater at issue is "hazardous" or whether the defendant intended the waste to remain [after closure]. It is clear that a facility is subject to regulations as a "disposal facility," and/or a "land disposal facility" where the facility is "intentionally used" to discharge hazardous waste. Even more important, the civil violations of RCRA provisions are properly characterized as strict liability offenses. *Cf. United States v. Liviola,* 605 F.Supp. 96, 100 (N.D. Ohio 1985) (comparing RCRA civil violations to those under Clean Air Act and Clean Water Act, noting that those offenses do *not* require proof of willful intent).

In *Fishel v. Westinghouse Elec. Corp.,* 617 F.Supp. 1531, 1537 (M.D.Pa.1985), the court noted that a plant could not be subject to regulation as a "disposal facility" where there are hazardous discharges which are merely accidental "because a person could hardly be called upon to obtain a permit for property upon which he does not anticipate disposing of wastes." Of course, that particular concern is not present here as I have previously found, based in large part on defendant's admissions, that the defendant is an owner/operator of a hazardous waste facility. Conse-

quently, the defendant's "definitional defense" appears to me to be "hypertechnical" as applied here and ultimately unpersuasive for the policy reasons previously articulated.

I find defendant's argument that the EPA approved its timely submission of a closure plan and that the plan submitted was characterized as a "clean-close" interesting, but ultimately not persuasive. In response to defendant's clean-close argument, plaintiff maintains that in any event some [hazardous] material *may*, nevertheless, remain after closure. More important, the *statutory* definition of "land disposal" includes "any placement" in a surface impoundment and that definition does not appear to depend on whether the material is intended to remain there after the facility is closed. Defendant, of course, argues strenuously that it did not intend that the material remain there and that under the closure plan a clean-close is contemplated.

In the absence of a specific statutory definition of "land disposal facility," I agree with plaintiff, and with the *T & S Brass* court, that the EPA's proffered definition of "land disposal facilities" encompasses the surface impoundments at issue here, is reasonable, and is entitled to "great deference." I find that this is so even assuming, *arguendo*, that the Allegan facility does not fit into the four corners of the *regulatory* definition of "disposal facility" found at 40 C.F.R. § 261.10.

As the *T & S Brass* court observed, "[t]he definition of 'disposal facility' urged by defendant was published in 1980 and by its terms applies only to 40 C.F.R. Parts 260 through 265 of EPA's regulations. *This definition is not, and does not purport to interpret what Congress meant by the term "land disposal facility."* *T & S Brass, supra* at 320 (emphasis added).

Accordingly, I find that the two ponds at the Allegan facility are surface impoundments within the meaning of RCRA and as such were subject to the November 8, 1985 LOIS deadline.

3) *Defendant failed to certify compliance or comply with the requirements of § 3005(e)(2)*

I have previously discussed in some detail the financial responsibility requirements and concluded that defendant failed to certify on or before November 8, 1985 that it had obtained the required liability insurance coverage and financial assurance for closure. Defendant admits that it did not obtain an irrevocable standby letter of credit which satisfied the financial assurance for closure requirement until January 31, 1986. *See* Defendant's Admission at ¶¶ 26 & 27; *see also* FND at ¶ 26.

Further, I reject in this enforcement action, defendant's assertion of the viability of an "impossibility" defense. As the *T & S Brass* court noted:

... an "impossibility" defense, *if it were to apply at all*, relates to a defendant's ability to comply with the law ... Compliance with the statutory deadline was mandatory, even if the defendant's only option was to cease its business on November 8, 1985. By imposing an absolute cut-off date for certifying compliance, Congress had already determined that protection of the public health and the environment was paramount.

*T & S Brass, supra,* at 321 (emphasis added).

4) *Defendant operated the facility without a permit and without the benefit of "interim status" beyond the November 8, 1985 cut-off date*

Defendant's admissions establish that it continued to place listed hazardous waste F006 into at least one of the holding ponds after November 8, 1985. *See* FND at ¶¶ 8 & 10. Further, it appears that this hazardous waste disposal continued until October, 1987. *See* FND at ¶ 8.

I conclude that partial summary judgment is appropriate on plaintiff's first claim, in that it has satisfied the requisite elements to make out a violation of section 3005(a) & (e).

*Plaintiff's Second and Third Claims for Relief*

Plaintiff also argues in its second and third claims for relief that defendant violat-

ed the requirements of the CAFO and that as a result of those violations it is entitled to judgment as a matter of law on the issue of defendant's RCRA § 3008(a) liability. Plaintiff's Second Claim for Relief provides:

> 38. Defendant failed to submit to U.S. EPA documentation of financial liability for sudden and non-sudden accidental occurrences in accordance with the requirements of 40 C.F.R. 265.147(a) and 265.-147(b), and as required by the Consent Administrative Order [CAFO].

Plaintiff's Third Claim for Relief states:

> 40. Defendant has failed to pay $13,000 of the penalty required by the Consent Administrative Order [CAFO]. Violation of the Consent Administrative Order is a violation of a requirement of RCRA.

Specifically, the present complaint alleges that defendant failed to 1) provide to the U.S. EPA documentation of financial assurance for closure within 45 days of entry of the CAFO; 2) provide to the U.S. EPA documentation that it possessed liability insurance for sudden and non-sudden accidental occurrences within 30 days of entry of the CAFO; and 3) pay a penalty of $16,000 within 60 days of the date of the CAFO.

#### 1) *Defendant's failure to provide to the EPA documentation of financial assurance for closure within 45 days of the entry of the CAFO*

■ The CAFO was entered on June 28, 1985. Accordingly, defendant's documentation of financial assurance for closure was due on August 12, 1985. Defendant has admitted that it did not provide the required documentation until January 31, 1986. *See* Defendant's Admissions at ¶¶ 26 & 34; *see also* Defendant's Brief in Support of Motion for Summary Judgment at 10–11. However, defendant has submitted the affidavit of Steven Alexander, of First of America Bank, which suggests that the EPA was kept apprised of the project financing efforts and that this time requirement was extended until January 31, 1986. Plaintiff argues that EPA did not grant defendant an extension of time to comply

with the requirement. Plaintiff has submitted the affidavits of Robert Leiniger and Pat Vogtman which indicate that the EPA responded to certain inquiries from Steven Alexander, a First of America loan officer, with respect to what documentation was required. *See* Leininger Aff. attached as Ex. A; Vogtman Aff. attached as Ex. B. Mr. Alexander's affidavit does not state that an extension was actually given, nor does it state when the alleged extension was requested or granted. Still, I am aware that I should not engage in a "trial by affidavit" when I am deciding a motion for summary judgment. When viewed in the light most favorable to the defendant, it appears that defendant has raised a genuine issue of material fact with respect to its alleged affirmative defense of waiver or estoppel as applied to this alleged violation.

Plaintiff argues that *in the absence of some affirmative misconduct* the United States is not subject to estoppel when it is exercising its sovereign power for the benefit of the public as it is in this enforcement action and as it did in entering into the CAFO. *Cf. Heckler v. Community Health Services of Crawford County, Inc.,* 467 U.S. 51, 104 S.Ct. 2218, 81 L.Ed.2d 42 (1984). Put differently, plaintiff argues that as a matter of law, the affirmative defenses of estoppel and waiver are not—presumably never—available when the government is exercising its sovereign powers. Here, of course, the EPA is responsible for regulating the nation's hazardous waste facilities and the plaintiff concludes, therefore, that these equitable defenses are unavailable.

To the extent that plaintiff suggests that the Government can never be subject to equitable estoppel when exercising its sovereign powers, I believe that plaintiff has overstated the state of the law. The *Heckler* Court clearly declined to "expand the rule that the government may not be estopped on the same terms as any other litigant ... into a flat rule that estoppel may not in *any circumstances* run against the Government." *Heckler,* 467 U.S. at 60, 104 S.Ct. at 2224 (emphasis added). The *Heckler* Court noted that "[w]hen the

Government is unable to enforce the law because the conduct of its agents has given rise to any estoppel, the interest of the citizenry as a whole in obedience to the rule of law is undermined." *Id.* Conceding that the arguments the Government advanced for its proposed inflexible rule were "substantial," the Court stopped short of "say[ing] that there are no cases in which the public interest in ensuring that the Government can enforce the law free from estoppel might be outweighed by the countervailing interest of citizens in some minimum standard of decency, honor, and reliability in their dealings with the Government." *Id.* at 60–61, 104 S.Ct. at 2224. Finally, the *Heckler* Court noted that beyond the heavy burden a private party would entail in proving its claim of estoppel, it would "at least have to prove that the traditional elements ... [were] present." *Id.* at 61, 104 S.Ct. at 2224.

In summarizing the principles of equitable estoppel, the Court noted that the party must show that it relied on its adversary's conduct " 'in such a manner as to change his position for the worse,' " and "that the reliance must have been reasonable in that the party claiming the estoppel did not know nor should it have known that its adversary's conduct was misleading." *Id.* at 62, 104 S.Ct. at 2225.

*Heckler*, of course, concerned the issue of the "double reimbursement" of a nonprofit provider of health care services. The Court easily found that the "misleading" oral advice given by a fiscal intermediary, acting as an agent of the government, to the provider, did not really result in an adverse situation for the provider. The Court noted that the provider's detriment was simply the "inability to retain money that it should never have received in the first place" and concluded that the provider did not lose "any legal right, either vested or contingent, or suffer any adverse change in its status." *Id.* The Court observed that "when a private party is deprived of something to which it was entitled as of right, it has surely suffered a detrimental change in its position." *Id.* at 62, 104 S.Ct. at 2225.

As an example of the type of case which caused the Court to balk at fashioning a *per se* "no-estoppel" rule, the Court, in a footnote, cited *NLRB v. Bell Aerospace Co.*, 416 U.S. 267, 295, 94 S.Ct. 1757, 1772, 40 L.Ed.2d 134 (1974) (noting that an administrative agency may not apply a new rule retroactively when to do so would unduly intrude upon reasonable reliance interests). *See Heckler*, 467 U.S. at 62 n. 14, 104 S.Ct. at 2225 n. 14. Although the case before me does not involve the application of a "new administrative rule retroactively," the broader teachings of *Heckler* are at play insofar as *Heckler* suggests that when the government acts in misleading ways it may not enforce the law where to do so would harm a private party as a result of that [governmental] deception. The gravaman of defendant's argument is that it was [mis]lead by the actions of the government: 1) to enter into a CAFO which by its terms appeared to operate prospectively, and 2) that it was told that it could have an extension on the due date for filing a financial assurance closure plan.

The results of defendant's reliance on the alleged misleading conduct [of someone at the EPA] was that the defendant's status changed from that of being an entity in compliance with the CAFO, to that of a violator of a final administrative order and consent agreement and for that reason is subject to "new" as well as "old" enforcement proceedings. Defendant specifically alleges that it timely obtained the letter of credit for closure, but delayed the filing of that letter while it sought alternative financing for the wastewater treatment system and that closure was sought through government assistance bonds, "with U.S. EPA's knowledge and consent." *See* Defendant's Trial Brief at 9. Moreover, it appears from the face of the complaint that plaintiff concedes that defendant's financial assurance plan, although untimely filed, nevertheless satisfied the RCRA requirements. *See* Complaint at ¶ 27.

Under the unique facts of this case, I decline to rule that equitable estoppel is unavailable as a matter of law, and further finds that I cannot grant summary judgment for either party with respect to the

issue of liability as to the timely filing of the financial assurance requirements as there appear to be material facts in dispute as to whether the documentation was deemed timely filed or ought to be deemed timely filed based upon the alleged conduct of the government.

2) *Defendant's failure to provide to the U.S. EPA documentation that it possessed liability insurance for sudden and non-sudden accidental occurrences within 30 days of entry of the CAFO*

■ Defendant has yet to provide the EPA with the proper documentation concerning the liability insurance requirement. *See* Defendant's Admission ¶ 26. It is true that the CAFO indicated that defendant could *request* a stay under paragraph 2.D of the CAFO, however, it does not appear that such a stay was granted. I find it insufficient that defendant submitted a document to the EPA in April 1985, approximately two months prior to the time that the CAFO was entered, which indicated that the defendant could not obtain liability insurance. That submission does not automatically satisfy the conditions for granting a stay as set forth in paragraph 2.D. of the CAFO.

Moreover, it appears that the regulations themselves provide for "variances," which are apparently the functional equivalent of permit modification requests, regarding the *levels* of financial responsibility required for sudden and non-sudden accidental occurrences provided those requests are made in writing to the Regional Administrator. *Cf.* 40 C.F.R. § 265.147(c) & (d). While the CAFO provision regarding the "stay" may be "consistent with" this regulation, it does not appear that defendant's submitted request would fall within the scope of and/or satisfy the regulation or the CAFO condition.

Further, I have previously indicated that I do not believe it proper to recognize the traditional contract defense of "impossibility of performance" in this action. Even assuming the defense is somehow applicable, plaintiff argues that compliance with RCRA in any event was not impossible in that even assuming defendant could not obtain the required insurance, it had the option of complying with the regulations by shipping its waste to a permitted facility and closing its lagoons.

I find that defendant inflates the legal import of the ALJ's statements in *The Matter of Landfill, Inc.*, No. IV–85–62–R (September 16, 1986). First, as plaintiff points out, *Landfill* did not directly concern the section 3005(e) requirement at issue here. In fact, it appears that the thrust of the ALJ's decision concerned the fact that the difficulty of obtaining insurance is greatly enhanced where a facility is no longer active. *Landfill, supra* at 13. More important, the ALJ in *Landfill* specifically noted that the financial responsibility regulations relating to liability insurance *do not contain a provision for "waiver" but rather only for a variance.* Further, the ALJ noted that an owner must demonstrate that the levels of financial responsibility are not appropriate before such a variance could be granted. The respondent in *Landfill* did not submit a request for variance. It does not appear from the submitted documents and/or from the parties' discussion that defendant ever filed a formal request for a variance. *Id.* at 19. Whatever precedential value the *Landfill* decision is accorded, it can also be read to support plaintiff's contention and the finding of this Court that no absolute waiver, that is, no impossibility or impracticality defense is available with respect to liability in this RCRA enforcement action. It appears that the ALJ simply chose, out of equitable considerations, not to assess a penalty regarding the respondent's liability coverage violation in that "respondent labored under the [misplaced] belief that it had some sort of a waiver....concerning the insurance requirements." *Id.* at 25.

In any event, I *do* believe that good faith efforts to obtain insurance are clearly admissible with respect to the appropriate civil penalty and possibly with respect to the scope of the injunctive relief sought. *Landfill* is clearly instructive in that regard.

In addition, I do not find defendant's *res judicata* defense available here. Plaintiff alleges that defendant has also violated RCRA because it continued to introduce hazardous waste into at least one of the surface impoundments after November 8, 1985. More precisely, plaintiff alleges that defendant introduced hazardous wastes *after* defendant lost its authorization to treat, store, dispose or introduce such wastes *because it failed to certify compliance with defendant's applicable financial responsibility requirements. See* Pre–Trial Order 2–3 (emphasis added). Again, this latter allegation appears, from one point of view, to be "derived from" the CAFO requirements, in that had all of the terms of the CAFO been timely complied with, defendant would not have "automatically" lost its interim status on November 8, 1985.

Under these facts, however, I am persuaded by plaintiff's argument that there is "nothing in the language of the CAFO to suggest that the CAFO operates prospectively or that it permits operation of the Allegan facility beyond the November 8, 1985 RCRA cut-off date." United States's Memorandum in Response to Defendant's Reply Brief in Opposition to United States's Motion for Partial Summary Judgment. This is true in that the parties consented to the entry of a consent agreement and *administrative order* which appears to have settled past RCRA violations and which required defendant to comply with its requirements *in a timely manner and to maintain compliance.* In that sense, I note that the agreement has a "prospective" thrust to it. Had the contingent terms of the agreement, and hence the order, been fully complied with in a timely manner, the Court does not see how EPA could seek a new RCRA action for those same past violations and/or how it could bring the present RCRA action by claiming the CAFO had no "prospective effect." However, it seems apparent that all past and future RCRA violations were not taken care of merely by defendant signing the CAFO and/or by its unilateral submission of certain documents without performing fully its conditions. Moreover, it is clear that under the statutes at issue here de-

fendant must be in "actual compliance" by certain dates and to "certify compliance" on those dates. *Cf. Vineland,* 810 F.2d at 409.

It is true that the CAFO allowed that the sixteen-thousand dollar ($16,000) penalty contemplated by its terms could be reduced to three-thousand dollars ($3,000) provided the defendant successfully complied with the items 2 through 4 within the specified time frames. *See* CAFO at 2–3. Still, where the terms were not complied with in a timely manner, the CAFO cannot be said to relieve defendant of its obligations to certify compliance under the RCRA amendments as well as under the CAFO's own terms.

Put differently, plaintiff argues that pursuant to section 3005(e)(2) of RCRA, defendant was required to certify by November 8, 1985 that it was in compliance with the financial responsibility requirements (liability insurance and closure assurance) of RCRA. Because defendant failed to make *this* certification, its continued discharge of hazardous waste into on-site holding ponds was prohibited.

When the certification was not forthcoming, plaintiff brought this civil action to obtain an injunction to cease the continued discharges and to obtain a civil penalty for defendant's violations of RCRA. Plaintiff steadfastly argues that the CAFO did not address these subsequent violations. (*See* this Opinion at 14–26 concerning Plaintiff's First Claim of Relief).

Because I find defendant's *res judicata* and impossibility defenses unavailing, I will enter an order granting plaintiff's motion for partial summary judgment with respect to its claim that defendant violated the CAFO by failing to provide to the U.S. EPA documentation that it, Allegan, possessed liability insurance for sudden *and* non-sudden accidental occurrences within 30 days of entry of the CAFO.

*3) Defendant's failure to pay a penalty of $16,000 within 60 days of the date of the CAFO*

█ It is clear to me that the CAFO provided that the defendant would be re-

quired to pay a penalty of $16,000, but that penalty would be reduced to $3,000 provided that all the requirements of the CAFO were met within the specified timelines. Allegan paid only $3,000 on January 31, 1986, *approximately 157 days after the due date specified by the CAFO.*

Defendant argues that it paid the specified mitigated civil penalty under the CAFO in that it paid $3,000 upon the [late] filing of the closure financial assurance plan. Defendant argues further that because the plaintiff accepted and negotiated the $3,000 check it submitted without protest, the doctrine of accord and satisfaction should apply and plaintiff should be barred from seeking the larger penalty. Further, defendant again argues that any ambiguity in the CAFO should be construed against the plaintiff, the apparent "drafter" of the "agreement."

Plaintiff argues that the doctrine of accord and satisfaction should not be recognized here in that it is not relevant to the enforcement of administrative or judicial consent decrees. That is, the plaintiff argues that a defendant cannot make partial payment of a civil penalty which is required by a decree as a means to discharge the full amount of the civil penalty. In the alternative, plaintiff argues that even assuming the applicability of the doctrine of accord and satisfaction, it is not available here in that defendant was only doing what it was obligated to do under the CAFO and hence there was no consideration.

I find it unnecessary to address directly all of the interesting arguments made by plaintiff in response to defendant's alleged contractual defense. For even assuming that the doctrine of accord and satisfaction should be applied here, based upon my previous analysis concerning liability insurance, it is clear that all of the terms of the CAFO were *not* complied with within the specified guidelines, and, accordingly, the proper penalty was that of $16,000 which should have been submitted within 60 days of the date of the CAFO.

Therefore, I will grant plaintiff's motion for partial summary judgment with respect to its claim that defendant failed to pay a penalty of $16,000 within 60 days of the date of the CAFO in violation of the express terms of the CAFO.

*Summary*

Still, I emphasize that the spirit of defendant's assertion that "plaintiff is now expressing dissatisfaction with its prior settlement agreement and seeks to re-open this enforcement without regard to that prior settlement" is not totally without merit. Defendant's Reply Brief in Opposition at 7. I also agree with the assertion that a company should only be subject to one RCRA enforcement action relative to the same claims—excluding, of course, the limited emergency exception spelled out in the CAFO. (To that extent, at least, it is clear that the CAFO always contemplated "emergency" prospective action, at least, under RCRA and/or other similar statutes).

██ I note that a final order which has been issued by an administrative agency pursuant to a consent agreement can under certain limited circumstances be considered a sufficient judgment on the merits to satisfy the requirements of *res judicata. Cf. Senior Accountants v. Detroit,* 399 Mich. 449, 457–458, 249 N.W.2d 121 (1976) (noting *res judicata* applies "to administrative determinations which are adjudicatory in nature, where a method of appeal is provided, and where it is clear that it was the legislative intention to make the determination final in the absence of an appeal."); *accord Storey v. Meijer, Inc.,* 160 Mich.App. 589, 408 N.W.2d 510 (1987). Defendant argues that the unappealed Final Order of the U.S. EPA, that is, the CAFO, is a "final judgment" subject to the doctrine of *res judicata. See* Defendant's Brief in Support of Defendant's Motion for Summary Judgment at 16. However, here the terms of the CAFO indicate that its effect was conditioned upon defendant satisfying certain contingencies which defendant did not satisfy.

This case can be compared to, and perhaps contrasted with, the type of case where a defendant is being charged with additional allegations of the "same" type of conduct—for example, additional, post con-

sent decree violations of a NPDES permit limitations governing the release of specified pollutants at given locations. *Cf. e.g., Chesapeake Bay Foundation v. Bethlehem Steel Corp.,* 652 F.Supp. 620 (D.Md. 1987) (discussing application of *res judicata* in suit under Clean Water Act). In *Chesapeake Bay,* the court noted that plaintiffs were precluded from litigating all claims which were the subject of state enforcement proceedings *which were concluded by a consent decree prior to trial.* However, the court noted that the decree provided prospectively for penalties for permit violations at a certain "outflow point" from January 1, 1979 until the defendant attained certain limitations. Defendant asserted that it did not attain such limitations until May 1980. Plaintiffs, in turn, alleged that there were a number of violations at the outflow point at issue between April 1979 and May 1980. The court held that the violations occurring at the outfall between January 1, 1979 and May 1980 were not *adjudicated* by the 1979 consent decree, but rather merely provided for penalties to be paid upon violation at the outfall. Accordingly, the plaintiffs were *not* barred by *res judicata* and could sue for a declaration that the defendant violated its permit governing the outfall between April 1979 and May 1980 (and beyond). *See Chesapeake Bay,* 652 F.Supp. at 629.

Defendant Allegan argues *Chesapeake Bay* court implicitly held that had the State, as opposed to a citizen group, brought an enforcement action which culminated in a final consent judgment *which resolved a previous action,* that consent judgment would foreclose subsequent litigation as to all claims addressed within the agreement. Defendant's Brief in Support at 16. I note that defendant Allegan's argument based on *Cheasapeake Bay* is set forth in conclusory terms. The factual situation in *Cheasapeake Bay* was actually quite complex and dissimilar to the case before me. The *Cheasapeake Bay* court held that the citizen plaintiffs were not barred by the doctrine of *res judicata* as to two of the three claims for which it sought

relief. The court held that the third claim issues were inadequately briefed.

It is clear that the legal analysis involved more than a recognition that different parties were involved. As I noted in the preceding paragraph, *Cheasapeake Bay* can also be read to hold that the prospective penalties provided in the consent decree were not adjudications—for either the State or the citizen group. Significantly, the *Cheasapeake Bay* court noted, that the relevance of the penalty provisions in the 1977 [state] consent decree to the penalties which would be established in the [citizen] suit would be determined at trial.

■ To the extent that the teachings of *Chesapeake Bay* are applicable to the fact situation in the case *sub judice*—especially with respect to the way that the penalty provisions and contingent terms of the CAFO at issue here are worded, I conclude that *res judicata* is not applicable to plaintiff's complaint as framed with respect to the first claim. Further, plaintiff's alleged action to enforce the consent decree is likewise not barred by *res judicata* insofar as plaintiff is merely seeking to enforce that decree. Here, I understand the plaintiff's argument to be that the failure to comply with the final order is itself a RCRA violation. Defendant, of course, has argued that a "new" RCRA violation is not contemplated by the terms of the CAFO and that it has complied with the CAFO. Although I have rejected that argument, I do not believe that plaintiff can, in effect, completely ignore the CAFO and relitigate all of the violations of the original administrative complaint which were "settled"— provided defendant timely complied with its terms. With the exception of plaintiff's allegation that there has been a violation of the "interim status" permit requirements because a Part A permit application was not [timely] filed by November 19, 1980, I not read the present complaint or understand plaintiff to now argue that defendant is also liable for the past RCRA violations claimed in the original administrative complaint. Here, of course, I exclude the two financial responsibility claims and the claim

of a late and inadequate payment of the specified civil fine set forth in the CAFO.

I believe that if the terms of the CAFO had been timely complied with, then the CAFO would have precluded a subsequent enforcement action with respect to any of the same issues contained in the CAFO. To hold otherwise, would indeed be to encourage litigation and discourage settlement of administrative disputes under RCRA. Such a ruling would no doubt promote a sense of uncertainty as to the finality of consent agreements and other forms of settlement. It is clear that such a result would be contrary to public policy. *See e.g., Thomas v. State of Lousiana,* 534 F.2d 613, 615 (5th Cir.1976) ("Settlement agreements have always been a favored means of resolving disputes. When fairly arrived at and properly entered into, they are generally viewed as binding, final, and conclusive of rights as a judgment.").

The CAFO at issue in this case appears to be a hybrid agreement, part contract and part final administrative order. In that respect it is something of an "odd bird," and, in any event, one which is not without its ambiguities. Defendant urges me to emphasize its contractual characteristics and to apply, exclusively, contract principles. Plaintiff emphasizes the fact that it is also a final administrative order with which defendant did not fully comply. There are clearly competing public policy issues at play here.

On the one hand, I believe that settlement agreements ought to be respected, and I consistently encourage such out-of-court resolutions, and, in fact, I believe that some form of alternative dispute resolution is advantageous to all parties and is readily applicable to most, if not all, disputes—including environmental enforcement actions.[1] On the other hand, it is difficult to overlook the fact that what is at stake here is the protection of the environment, and it is clear that groundwater pollution is a prime concern of the public at large and a grave problem which potentially threatens life itself. The fact that RCRA—like other remedial statutes which focus on damage to the environment—is a strict liability statute, and the fact that it also has criminal provisions not at issue here, reflects the gravity of the situation and the depth of congressional concern. Accordingly, it is hard to say that the Government, acting in its sovereign capacity, can ever [completely] bargain away its duty to enforce the laws enacted by Congress for the protection of all. I am not at all saying that is what has occurred here. I am merely pointing to the potential policy issues at play whenever a court is called upon to interpret "hybrid" consent/enforcement agreements such as the one entered in this case.

Further, it is also clear that in a democratic society citizens have a right to place trust in their government and its officials who serve them. In an increasingly administrative state that concern is amplified where accountability is often difficult to ascertain. In that regard Justice Black once observed, "[o]ur Government should not by picayunish haggling over the scope of its promise, permit one of its arms to do that which, by any fair construction, the Government has given its word that no arm will do. It is no less good morals and good law that the Government should turn square corners in dealing with the people than that the people should turn square corners in dealing with their government."

1. I note in passing that in a recent article, *Alternative Dispute Resolution and Environmental Enforcement: A Noble Experiment or a Lost Cause?,* 18 Environmental Law Reporter 10087, March 1988, Richard H. Mays, former senior enforcement counsel and acting assistant administrator of EPA—and a pioneer in the use of ADR at the EPA—observed that the response of most regions to the administrator's appeal to consider ADR was "almost nonexistent." Interestingly, Mays links the lack of environmental enforcement with the lack of other incentives for ADR use. Mays lists the pros and cons of "environmental ADR" from the perspective of the government and that of the private sector and concludes that "[t]he enforcement of ADR programs has been born at EPA and ... is a noble and progressive experiment." Still, Mays cautions that without support and encouragement, "it will have a slow, stunted growth and may wither." *See also* BNA's Alternative Dispute Resolution Report, March 31, 1988 Vol. 2, Number 7 at 107–109.

*St. Regis Paper Co. v. United States*, 368 U.S. 208, 229, 82 S.Ct. 289, 301, 7 L.Ed.2d 240 (1961) (J. Black, dissenting). Neither am I saying that there was any active misleading involved here. Again, I am merely pointing out the inherent tension that exists between competing public policies.

In sum, it is difficult for me to ascertain precisely where the proper "analytical" stress ought to fall in interpreting this "agreement." Put differently, should I accentuate the "CA" as opposed to the "FO" aspect of the CAFO? Defendant suggests, applying contract principles, that any ambiguity ought to be construed against the drafter of the agreement. Plaintiff suggests that contract terms are not strictly applicable here, and in response to defendant's accord and satisfaction argument, argues that under the principles of that doctrine there can be no consideration here because the defendant is simply being made to do that which it is required to do by law: comply with a statute.

To my mind, neither analysis is completely satisfactory. It does appear to me that timeliness was a prime consideration in structuring the terms of the agreement and that in any event all of the terms were not fully satisfied. Accordingly, I find that it is proper for plaintiff to bring an action to enforce the CAFO. Moreover, while it is not completely clear whether or not that the CAFO was intended to have a "prospective effect,"—that concern is, in effect, moot, where the terms were not fully and timely completed. However, although I have found that an action to enforce the CAFO lies, I will not completely unravel the agreement and permit a "new" RCRA enforcement claim for each and every term and for each RCRA violation alleged in the original administrative complaint where it appears that defendant has substantially complied with the CAFO.

As I have previously mentioned, it is clear that the CAFO itself expressly allowed that some future RCRA action might always be possible under certain circumstances. The CAFO clearly provides that "[n]otwithstanding any other provision of this Order, an enforcement action could be brought pursuant to Section 7003 of RCRA or other statutory authority should the U.S. EPA find that the handling, storage, treatment, transportation or disposal of solid waste or hazardous waste at the facility presents an imminent and substantial endangerment to human health or the environment." *See* Ex. A attached to Defendant's Motion for Summary Judgment— CAFO at 4. This provision perhaps best illustrates the Government's ongoing concern and duty that it not bargain away enforcement rights which protect the public at large from imminent environmental danger.

 In sum, I do not find that the mere existence of the CAFO, the full terms of which were not timely complied with, precludes the bringing of the present action to "enforce" the CAFO, nor does the CAFO preclude a separate RCRA action based on the LOIS violation previously mentioned. However, I believe that there appears to be some measure of regulatory "overkill" in the way that this complaint was framed and in the apparent scope of relief sought. For example, it is hard for me to understand how plaintiff can seek enforcement of the CAFO *and*, apparently, seek to hold defendant liable for violations of RCRA § 3005 permit and *interim status requirements since November 19, 1980*. While it is clear that this is not a criminal action, it seems to me that some portion of the potentially substantial civil penalties plaintiff is apparently seeking may be likened to prosecutorial "overcharging." I will necessarily consider this factor in determining the appropriate civil penalty to be assessed—an issue not presently before me. I find that this is especially true here where it appears—based on the numerous documents and arguments already presented—that the defendant has apparently acted in good faith at all times relevant to this action, was in substantial compliance with the CAFO, and where the CAFO violations which did occur may well have been *de minimus*.

*Judicial review under the Administrative Procedures Act*

 Defendant also argues that it should be excused from the pollution liability insurance coverage requirement under RCRA and the CAFO in that it has provided documentation of its good faith efforts to the EPA pursuant to the provisions of the CAFO. Defendant argues that the EPA's actions in refusing to stay, or waive, the liability insurance requirements are "arbitrary and capricious."

Plaintiff argues that I do not have jurisdiction to review the EPA's decision in this regard. Plaintiff argues further that defendant's assertion that the EPA's action is reviewable under the Administrative Procedures Act ("APA") borders on the frivolous in that interpretation of this CAFO provision is not agency rule making to which the APA applies. Plaintiff argues further that defendant has not provided any evidence or an explanation how the EPA acted in bad faith in applying the CAFO. Finally, plaintiff argues that defendant's assertions do not establish a defense to the "admitted" violations of section 3005(e) and that the assertions are only relevant, if at all, with respect to the my determination of an appropriate civil penalty. *See* United States's Memorandum in Response to Defendant's Reply Brief in Opposition to United States's Motion for Summary Judgment at 6 n. 5.

Defendant argues, without citing any case law for its proposition, that I can review the EPA's actions in this case under the arbitrary and capricious standard set forth in 5 U.S.C. § 706(2)(A). That section of the APA, of course, only refers to the *scope of review* assuming a court first has jurisdiction. RCRA itself provides for judicial review of final regulations, for certain petitions and for actions relating to permit requirements, interim status, etc. in 42 U.S. C. §§ 6976(a) and (b). It is clear that section 6976 provides that such actions brought to review the conduct of the Administrator shall be brought *before the Circuit Court of Appeals* for the federal judicial district in which the person seeking review resides or transacts the related business. Still, to the extent that defendant is really seeking a review of its loss of interim status based upon the EPA's decision concerning the liability insurance requirement as expressed in the regulations and the CAFO, it is not at all clear that even if this issue were somehow properly before *the Sixth Circuit* that *it* would find jurisdiction in this instance. *Cf. Northside Sanitary Landfill, Inc. v. Thomas*, 804 F.2d 371 (7th Cir.1986) (noting that in RCRA action interim status is not considered a "permit" within the meaning of the judicial review provision of § 6976(b), and *rejecting* defendant's argument that the termination of its interim status without a formal evidentiary hearing constitutes a deprivation without due process of law in that defendant has no property interest in continuing to operate under interim status); *cf. also Environmental Defense Fund Inc., v. Gorsuch*, 713 F.2d 802 (8th Cir.1983); *but see Vineland Chemical Co., supra*, (finding, in context of RCRA action, that EPA's decision to terminate hazardous waste disposal facility's interim status was reviewable *by court of appeals*).

Further, I believe that to give full play to defendant's asserted defense concerning the impracticability of securing insurance would require me to resolve an issue which under the regulatory scheme Congress has seen fit to place within the special competence of the EPA. The function that the EPA fulfills would not be advanced by my resolution of the insurance liability issue. I am aware that even where primary jurisdiction belongs to an agency, a court may sometimes still review that agency's action. However, the issue as framed is inextricably intertwined with the EPA's decision to grant interim permits and variances, judicial review of which is properly committed to the appellate court by the statute itself.

I conclude that defendant's assertion that I have jurisdiction under the APA to find that the EPA's failure to relieve the defendant from RCRA's liability insurance requirements was "arbitrary and capricious" is without merit. To give defendant the remedy it seeks would require me to essentially exercise an administrative func-

tion. Still, assuming I may properly modify the EPA's decision on the basis that defendant's substantial rights have been prejudiced because the administrative findings and/or the discretionary decision with regard to the "insurance waiver" are "arbitrary and capricious" or characterized by an abuse of discretion would require me to scrutinize some non-existent administrative record where the terms of the CAFO expressly provided that "the ... [defendant] ... waived its rights to a hearing on the allegations in the Complaint ..." *See* CAFO at 5 attached as Ex. B; *see also* Administrative Complaint at ¶ 18g attached as Ex. G. Thus defendant's request that I declare that there has been a failure to exercise discretion or that discretion has not been exercised at all must be denied.

Moreover, as I have previously recognized, the plaintiff has convincingly argued that the EPA did carefully consider, via the notice and comment procedure, the regulations relating to the liability insurance requirements at issue here. *See* this Opinion at 18–19. In the alternative, even assuming that I somehow have jurisdiction to hear defendant's APA claim or defense, the EPA's interpretation of its regulations should be given great weight. *Cf. National Steel Corp., Great Lakes Steel v. Gorsuch*, 700 F.2d 314, 321 (6th Cir.1983) (discussing limited scope of review of EPA rulemaking *authority* in Clean Air Act context, and noting, specifically, the constrained review of the choices EPA *actually makes* under the "arbitrary and capricious" standard). Interestingly, the Sixth Circuit noted that it has previously expressed "genuine doubt" whether a court of appeals ever has the power to consider an objection to a state implementation plan on the grounds that the plan's requirements are "infeasible" even where the plan is EPA-designed *because of the "technology-forcing character" of the requirements of the Clean Air Act*. I believe these "forced" insurance liability requirements are analogous to those "forced technology" requirements.

In any event, I find no merit in plaintiff's argument that I have the jurisdiction to review the EPA's actions. Further, even assuming, *arguendo*, I have jurisdiction, I cannot find the EPA's actions in this case "arbitrary and capricious."

*Appeal of the Magistrate's order denying joinder of State of Michigan as a party plaintiff*

Pursuant to Rule 72(a) of the Federal Rules of Civil Procedure, I have reviewed the transcript of the hearing held before Magistrate Doyle A. Rowland on May 27, 1988 concerning plaintiff's motion for joinder of state of Michigan as party plaintiff. I cannot say that the Magistrate's order denying compulsory joinder of the State of Michigan was clearly erroneous or contrary to law. Accordingly, I will deny plaintiff's appeal.

I note that although the State of Michigan is interested in the results of this action in that it has some potential effect on compliance with state law and with the protection of the environment, this interest is not the legal interest contemplated within the meaning of Rule 19(a). In any event, this finding would be of no help to *plaintiff*. Moreover, under the provisions of RCRA each sovereign actually has a separate claim against the defendant which is derived from the defendant's duty to comply with both federal *and* state law.

Further, I agree with the Magistrate's finding that even if the State of Michigan were to bring its own enforcement action, defendant would not be subject to inconsistent obligations. I believe that the Magistrate correctly found that the possibility of "additional" [state law] obligations in this context does not meet the Rule 19(a) standard. *See* Transcript of May 27, 1987 hearing at 32. Accordingly, I find that the Magistrate correctly analyzed the "double, multiple, or otherwise inconsistent obligations" standard under Rule 19(a). Moreover, I note that a penalty or fine sought by the State of Michigan for violation of *state* law would not be a double, multiple, or otherwise inconsistent obligation within the meaning of Rule 19(a).

*Conclusion*

For all the reasons previously set forth in this opinion, I will enter an order grant-

ing plaintiff's motion for partial summary judgment in part and denying it in part; denying defendant's motion for summary judgment; denying plaintiff's appeal from the Magistrate's Order of May 27, 1987. In addition, because my ruling has substantially determined the liability issues in this case, I will deny defendant's motion in limine requesting the impaneling of an advisory jury. Similarly, I will deny defendant's motions in limine to offer additional trial exhibits and to exclude evidence of alleged prior violations without prejudice. Finally, I will deny plaintiff United States's motion in limine regarding a pretrial ruling on the admissibility of evidence relating to defendant's state of mind and alleged "impossibility" of RCRA's insurance requirements as moot.