**UNITED STATES of America,
Plaintiff-Appellant,**

v.

**FORD MOTOR COMPANY,
Defendant-Appellee.**

No. 85–1945.

United States Court of Appeals,
Sixth Circuit.

Argued Dec. 8, 1986.

Decided March 27, 1987.

Geneva S. Halliday, Asst. U.S. Atty., Detroit, Mich., Ellen J. Durkee, David C. Shilton, Appellate Section, Lands Div.–Dept. of Justice, Washington, D.C., William B. Lazarus (argued), for plaintiff-appellant.

Elizabeth N. Carroll, Robert A. Fineman, Detroit, Mich., Mary F. Edger, Thomas H. Truitt (argued), Washington, D.C., for defendant-appellee.

Before ENGEL and JONES, Circuit Judges, and EDWARDS, Senior Circuit Judge.

GEORGE CLIFTON EDWARDS, Jr., Senior Circuit Judge.

In this case Ford Motor Company and the United States are litigating a question fundamental to the authority of the federal government to control the emission of air pollutants within the boundaries of a particular state.

The pollutants at issue are volatile organic compounds which are the principal contributors to ambient ozone. The site of this dispute is a Ford Motor Company plant located in Mount Clemens, Michigan. This factory coats vinyl products with solvent-based coating and emits ambient ozone from eight production lines.

Plaintiff cites a vivid description of the problems posed by ozone from the District of Columbia Circuit Court of Appeals:

> Ozone is the primary cause of the ill effects associated with smog, of which it usually comprises 65–100%. At certain concentration levels, ozone irritates the respiratory system and causes coughing, wheezing, chest tightness, and headaches. Due to its irritating nature, ozone can aggravate asthma, bronchitis, and emphysema. Some studies indicate that chronic exposure to fairly low levels of ozone may reduce resistance to infection and alter blood chemistry or chromosone structure. Ozone can destroy vegetation, reduce crop yield, and damage exposed materials by causing cracking, fading, and weathering.

*American Petroleum Institute v. Costle,* 665 F.2d 1176, 1177 (1981), *cert. denied,* 455 U.S. 1034, 102 S.Ct. 1737, 72 L.Ed.2d 152 (1982).

The origin of this dispute is dated a decade ago. In February 1979 the United States Environmental Protection Agency (EPA) promulgated a combined primary and secondary national ambient air quality standard for ozone. This action was based on federal law, § 109 of the Clean Air Act, 42 U.S.C. § 7409. Michigan promulgated a State Implementation Plan which governed pollutants contributing to ozone formation in 1979, and U.S. EPA approved the State Implementation Plan in 1980. Two separate legal proceedings followed. On Sep-

tember 26, 1984, the United States initiated the first action under § 113(b) of the Clean Air Act, 42 U.S.C. § 7413(b), to enforce the EPA-approved State Implementation Plan (SIP). A month later, the Ford Motor Company filed suit in a Michigan state court against the Michigan Air Pollution Commission, the Michigan Natural Resources Commission, and the Michigan Department of Natural Resources. Ford sought to enjoin the state defendants from enforcing the State Implementation Plan concerning which the United States had filed the first action. EPA was not a party to the state action nor was it notified of its pendency.

Ford and the state defendants named above then negotiated a consent judgment which was entered March 18, 1985. Ford then filed a motion for summary judgment in the federal proceeding contending that the EPA-approved SIP could not be enforced because the state court consent judgment had invalidated it. On August 5, the United States District Court orally granted the Ford Motor Company's motion and dismissed the federal government's action. After the United States' motion for reconsideration and modification of the District Court's judgment had been denied, the United States initiated this appeal.

Ford's contention in this litigation is that the state court consent judgment is controlling and that the United States has no authority to overrule it. Essentially the United States District Court accepted this point of view.

█ As we see the question posed by this case, it is as follows: whether a state court consent order which was entered in an action brought by the defendant (Ford) against state air pollution regulatory authorities but not the United States or any of its agencies, and which purportedly vacated a State Implementation Plan adopted under the Clean Air Act and approved by EPA, precludes federal enforcement of the previously federally-approved plan?

We believe that under the United States Clean Air Act and settled case law, the answer to this question must be "no."

■ Although it is clear that the Clean Air Act contemplates very significant participation in air pollution control by state air pollution control agencies, it is equally clear that the final authority is vested in the United States Environmental Protection Agency and the courts of the United States. In *Train v. NRDC*, 421 U.S. 60, 64, 95 S.Ct. 1470, 1474, 43 L.Ed.2d 731 (1975), the United States Supreme Court pointed out that the 1970 amendments to the Act had "sharply increased federal authority and responsibility in the continuing effort to combat air pollution." Justice Rehnquist, now Chief Justice, writing for a nearly unanimous Supreme Court held:

> [A] polluter is subject to existing requirements until such time as he obtains a variance, and variances are not available under the revision authority until they have been approved by both the State and the Environmental Protection Agency. Should either entity determine that granting the variance would prevent attainment or maintenance of national air standards, the polluter is presumably within his rights in seeking judicial review. This litigation, however, is carried out on the polluter's time, not the public's, for during its pendency the original regulations remain in effect, and the polluter's failure to comply may subject him to a variety of enforcement procedures.

*Train v. NRDC*, 421 U.S. at 92, 95 S.Ct. at 1488 (footnote omitted).

The Supreme Court's conclusion in *Train* is based upon the language of the Clean Air Act, which requires revisions of State Implementation Plans to be approved by EPA before such revisions are effective. *See* 42 U.S.C. § 7410(a)(3)(A) & (i).

The ultimate authority of the United States EPA is indeed recognized by the state Staff Report on which the commission's final order and state court judgment were based. In the Supplemental Amended Answer, Exhibit 3, that report stated:

> If approved by the Commission the Order will be submitted to the United States Environmental Protection Agency (EPA)

as a revision to the State Implementation Plan (SIP).

\* \* \* \* \* \*

Because the proposed Order reflects limits that are different than those in the currently approved Michigan SIP, the order must be submitted to EPA as a revision to the SIP. Such "site specific" SIP revisions for existing sources must meet certain criteria in order to be approvable.

We observe at this point that standards for purification of the ambient air simply cannot be set along the boundaries of our 50 states. The winds, of course, recognize no such boundaries. The 50 states of this union compete intensely with one another for industry. As Congress has recognized, if state control of ambient air emissions were final, in short order, major shifts of smoke stack industries to states with the most lenient pure air standards would inevitably take place. Absent final authority in United States EPA, the attainment goals of the Clean Air Act would prove ephemeral.

In the face of overwhelming authority declaring that revisions of State Implementation Plans are ineffective until approved by EPA, Ford relies principally on a Seventh Circuit decision, *Sierra Club v. Indiana-Kentucky Electric Corp.*, 716 F.2d 1145 (7th Cir.1983). *Sierra Club* was a citizen suit seeking to enforce an EPA-approved SIP provision in federal court. Prior to the federal lawsuit, a state appellate court had held the provision invalid on state procedural grounds, namely that the state officer who presided over the hearing on the provision had failed to submit written findings to the Indiana Environmental Management Board, as required by state law. This failure to make written findings made it impossible for the Board to evaluate and review the decision. The Seventh Circuit held that federal enforcement was barred because the SIP provision was not adopted in accordance with applicable state procedures, and therefore, was an invalid plan submission to EPA. The SIP, thus, was never valid. The Seventh Circuit, however, acknowledged that the revision or modification of a valid plan must be approved by the EPA to become effective.

716 F.2d at 1152. The court thus concluded that:

> Once a plan is adopted by the states and it *withstands any subsequent procedural challenge*, then § 7607(b)(1) provides that invalidation may occur only in the federal appellate courts.

*Id.* (emphasis in original).

■ The present suit, unlike *Sierra Club*, concerns invalidation of a SIP on technical grounds by a state court. Thus, even under the language of *Sierra Club*, such invalidation cannot be given effect, because invalidation of an EPA-approved SIP may only occur in the federal appellate courts on direct appeal from the Administrator's decision under § 7607(b)(1), and revisions and variances of properly promulgated SIPs require EPA approval. This case, in short, does not concern a SIP found invalid on state procedural grounds by a state court, as was the case in *Sierra Club*.[1] Nor does the fact that the consent decree in this case purported to vacate and modify the SIP as of its compliance date render it void *ab initio* in the sense described in *Sierra Club*. The mere fact that state authorities, through the discovery of subsequent technical data, or otherwise, change their views on the technological or economic feasibility of a properly adopted emission limit cannot in itself render the original emission limit unenforceable. As this court has stated, "the Act clearly envisions the possibility of continuous adjustments in the basic plan by the State and the EPA. If a plan became unenforceable every time such a revision became a possibility, the entire enforcement procedure of the Clean Air Act would be crippled." *Ohio Environmental Council v. United States District Court*, 565 F.2d 393, 398 (6th Cir.1977) (citations omitted). Instead, the original emission limit remains fully enforceable until a revision or variance is approved by both the State and EPA. *Id.*

■ Ford raises two additional arguments. First, Ford argues that EPA is barred from asserting the validity of the SIP by the final judgment of the Michigan Circuit Court. Ford's reliance on collateral estoppel borders on the frivolous. First, it is questionable whether the consent judgment, which specifically states that it should be transmitted to EPA for approval as a SIP revision, was intended to do any more than invalidate the SIP for state law purposes. Second, it is doubtful whether EPA can be held to be in privity with the State of Michigan as required by collateral estoppel principles. Third, it is questionable whether the consent judgment on which Ford relies meets the "actually litigated" collateral estoppel requirement.

■ Fundamentally, however, we must find collateral estoppel inapplicable to this case, because Congress, as demonstrated above, has given EPA the final authority to approve revisions of EPA-approved SIPs. State courts thus lack the authority to invalidate EPA-approved SIPs on infeasibility grounds. *See Train v. NRDC, supra*, (existing SIP enforceable until SIP revision approved by EPA). The Clean Air Act thus modifies the operation of the Federal Full Faith and Credit Statute, 28 U.S.C. § 1738, and determines the permissible effect of the state court judgment at issue.

■ Second, Ford argues that refusal to give effect to the Michigan Circuit Court judgment would violate Ford's Fifth Amendment due process rights. Ford notes that state court is the only forum available for challenging the technological and economic feasibility of SIP provisions. Ford argues that the failure to give binding effect to the feasibility determination made by the only available forum deprives it of property without a meaningful right to be heard.

Ford's contention can best be answered by noting that the Clean Air Act envisions situations where standards currently economically or technologically infeasible will nonetheless be enforced. *See Union Electric Co. v. EPA*, 427 U.S. 246, 258–59, 96

---

1. The government indicated at oral argument that it may take the position in future litigation that *Sierra Club* was wrongly decided. Because we find *Sierra Club* readily distinguishable, we neither approve nor disapprove its conclusion that state courts may invalidate EPA-approved State Implementation Plans on state procedural grounds.

S.Ct. 2518, 2526, 49 L.Ed.2d 474 (1976); *National Steel Corporation Great Lakes Steel Division v. Gorsuch,* 700 F.2d 314, 324–25 (6th Cir.1983). Congress has the authority to demand that "existing sources of pollutants either should meet the standard of the law or be closed down...", regardless of whether such standards are currently feasible. S.Rep. No. 91–1196, p. 2–3 (1970), quoted in *Union Electric Co., supra,* 427 U.S. at 259, 96 S.Ct. at 2526.

In addition, we note that meaningful opportunities for raising claims of technological and economic infeasibility have been provided by the Act. *See Union Electric Co., supra,* at 266–69, 96 S.Ct. at 2529–31. While the attainment of national standards remains paramount, *id.* at 268, 96 S.Ct. at 2530, emission sources such as Ford are offered the opportunity to have significant input on the setting of emission limits through the appropriate voicing of feasibility concerns. Ford, for example, participated in the state's promulgation of the SIP in 1979 and in EPA's approval of the SIP in 1980.

Ford's subsequent challenge of the SIP on feasibility grounds in the state court has resulted in the state proposing a revision of the SIP to EPA for approval. Thus the state court judgment, while not binding on EPA, is significant, because it has effected the first step in the revision process: the proposal of a revision to EPA by the state.

Furthermore, technical infeasibility coupled with good faith efforts can be considered by the district court as a factor mitigating against the imposition of monetary penalties in the enforcement action. On the other hand, "the absence of demonstrable good faith efforts toward compliance should serve to dampen any enthusiasm for technological and economic arguments advanced in defense of a claimed violation." *Indiana & Michigan Electric Co. v. EPA,* 509 F.2d 839, 845 (7th Cir. 1975).

The judgment of the District Court is reversed and the case is remanded for further proceedings consistent with this opinion.