**KENTUCKY RESOURCES COUNCIL, INC. and Sara Lynn Cunningham, Plaintiffs**

v.

**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, Natural Resources and Environmental Protection Cabinet, Louisville Metro Air Pollution Control District and Louisville Metro Air Pollution Control Board, Defendants.**

Civil Action No. 3:03CV–712–H.

United States District Court, W.D. Kentucky, at Louisville.

Jan. 29, 2004.

---

Thomas Joseph FitzGerald, Kentucky Resources Counsel, Frankfort, KY, for Plaintiffs.

Michael C. Haines, John G. Horne, II, Kentucky Natural Resources & Environ-mental Cabinet, Frankfort, KY, for Defendants.

Lauren Anderson, Scott N. Lilly, William Patrick O'Brien, Jefferson County Attorney, Louisville, KY, for Cross Claimants.

## MEMORANDUM OPINION

HEYBURN, Chief Judge.

Just a few months short of twenty years after it began the vehicle emission testing program (the "VET"), the Louisville Metro Air Pollution Control District (the "District") decided to terminate that program, upon the command of KRS 77.320. Plaintiffs, a group of Louisville residents, challenge that decision on the grounds that the District lacks the authority under the Clean Air Act, 42 U.S.C. § 7401 *et seq.* (the "Act"), to take such action without approval of the United States Environmental Protection Agency (the "EPA").

The Act envisions a cooperative process by which the Kentucky Natural Resources and Environmental Protection Cabinet (the "Cabinet"), the District, and the EPA, not the courts, are supposed to make important decisions about our local air quality control. That a court must intervene is a sign that the process has failed. Nevertheless, this case does not require the Court to determine whether the VET program is either a necessary or beneficial means of improving our community air quality. Rather, the Court must determine who has the authority to decide that question and what law they must follow in doing so.

For the reasons set forth carefully in this Memorandum Opinion, the Court concludes that the Kentucky state legislature is without authority to interpose its particular air quality control enforcement preferences under these circumstances or in this manner. As a consequence, and in the

absence of clarifying or cooperative direction from the EPA, Plaintiffs are entitled to equitable relief requiring the Cabinet and the District to comply with the Act, which would include restarting the VET program.

## I.

■ The purpose of the federal Clean Air Act is to create a cooperative partnership between the states and the federal government to enforce air quality standards on a nationwide and local basis. The EPA develops national ambient air quality standards. The individual states devise implementation plans to attain compliance with those standards and objectives. The state implementation plan is referred to as a SIP. The Cabinet has responsibility for proposing and implementing the Kentucky SIP. It contains specific measures to meet the required clean air standards for this state. 42 U.S.C. § 7502(c)(6). The EPA must approve every SIP. *Id.* § 7410(k). Upon approval, a state or local SIP is printed in the Federal Register and becomes enforceable as federal law. *See ·Gen. Motors Corp. v. United States,* 496 U.S. 530, 540, 110 S.Ct. 2528, 110 L.Ed.2d 480 (1990). A state may seek approval from the EPA to revise its SIP. § 7410(a)(2).

As authorized by the Act, the Cabinet has delegated to the District the power to propose that portion of the SIP applicable to Jefferson County. In 1982, the Cabinet proposed revisions to the Kentucky SIP for Jefferson County to comply with the Act. The revisions included establishing the VET program. After a lengthy period of consultation, the EPA approved the plan. 49 Fed.Reg. 39,547 (Oct. 9, 1984) (to be codified at 40 C.F.R. pt. 52).[1] In 1990,

the EPA approved the Cabinet's request that Jefferson County be redesignated as in attainment for carbon monoxide based upon ambient monitoring data and its EPA-approved control strategies, which included the VET program. 55 Fed.Reg. 14,092 (Apr. 16, 1990) (to be codified at 40 C.F.R. pt. 81). On October 23, 2001, the EPA designated the District as in attainment of all current ambient air quality standards and approved the District's maintenance plan that included continuation of the VET program. 66 Fed.Reg. 53,665 (Oct. 23, 2001) (to be codified at 40 C.F.R. pts. 52 & 81).

In each of these instances, the District's proposals and the EPA's approvals addressed the existing air quality standards, which included the so-called one-hour standard for ozone codified in 1979. In 1997, the EPA proposed two new ambient air quality standards: one for fine particulate matter and an eight-hour standard for ozone. After several years of litigation, the Supreme Court upheld the new standards. *See Whitman v. Am. Trucking Ass'ns, Inc.,* 531 U.S. 457, 121 S.Ct. 903, 149 L.Ed.2d 1 (2001). The EPA contends that they now apply nationwide and is in the process of developing transition rules to govern these more stringent standards.

The VET program has always generated more than its share of controversy. By necessity, it imposes a certain amount of inconvenience and expense upon citizens whose vehicles regularly meet its standards. Not surprisingly, many people find the testing requirement intrusive and wasteful.[2] On the other hand, many believe that the VET is absolutely essential to controlling our region's nagging and

---

**1.** The VET actually began operation on January 3, 1984.

**2.** This burden has not gone without notice. Several years ago County Judge Executive

Rebecca Jackson proposed a revision of the VET program to exempt certain new vehicles from testing. The District has yet to submit this proposal to the EPA for approval.

well-documented air pollution problems. The current dispute arises from the determination of the VET's opponents to force its termination. Consequently, the Court will carefully describe the largely undisputed course of events that has led to federal court.

Immediately after the EPA declared the District in compliance with all ambient air quality standards in 2001, the Kentucky General Assembly, during its 2002 session and at the apparent urging of VET opponents, devised a means by which it hoped to force an end to the program. House Bill 618, subsequently codified as KRS 77.320, purported to compel the new Louisville Metro Government to eliminate the VET program by November 1, 2003.[3] The District's Board strenuously opposed this legislation. After the Kentucky House and Senate approved it, the District's director, Arthur L. Williams, acting on behalf of the District's Board, submitted a lengthy analysis urging the Governor to veto the legislation. The letter cited numerous and rather persuasive environmental, economic, practical, and legal concerns in opposition to the proposed legislation. Despite this plea, the Governor signed House Bill 681, and it became law.

Only six months later when the new Louisville Metro Government came into being in January 2003, the District was apparently determined to comply with both that new state statute and the Act. On July 7, 2003, therefore, the District proposed various revisions to the Kentucky SIP to eliminate the VET program. The primary motivation and purpose of these revisions were to comply with the new state statute. On August 14, 2003, the EPA preliminarily advised the District that any SIP revision must consider the new eight-hour ozone and fine particulate matter standards. Because the proposed revision did not consider those standards, the District knew then that the EPA was not likely to approve the SIP revision simply as a matter of course.

Nevertheless, on August 27, 2003, the District submitted a formal request to the EPA for approval to revise the SIP by eliminating the VET. About the same time, it took preliminary steps to terminate vari-

---

3. The statute, which became effective July 15, 2002, contained certain conditions precedent to eliminating the VET: the community must be in compliance with existing EPA ambient air standards. KRS 77.320 states in full:

(1) If by December 1 following the approval of a consolidated local government, the county containing the adopted consolidated local government has been notified by federal authorities of the attainment of the county of the air quality standards established by the Federal Environmental Protection Agency for ozone, carbon monoxide, and nitrogen dioxide, the air pollution control district board in that county shall upon July 15, 2002, begin the necessary actions to eliminate any vehicle emissions testing program operated in the county by November 1, 2003. The air pollution control district board shall not enter into or renew any contracts with any vendors for the operation of a vehicle emissions testing program which would extend beyond this date.

(2) If a consolidated local government should be notified at a date beyond November 1, 2003, of the county's nonattainment of the air quality standards established by the Federal Environmental Protection Agency for ozone, carbon monoxide, and nitrogen dioxide, notwithstanding the provisions of KRS 77.115, 224.20–130, or 224.20–760 to the contrary, the consolidated local government shall determine the need for the reestablishment, administration, operation, and the role, if any, of an air pollution control district if a vehicle emissions testing program is re-created by the consolidated local government in accordance with KRS 224.20–710 to 224.20–765. Nothing in KRS Chapters 77 and 224 shall preclude a consolidated local government from utilizing other methods and procedures for reaching attainment of the air quality standards established by the Federal Environmental Protection Agency for ozone, carbon monoxide, and nitrogen dioxide.

ous employees and contracts preparatory to ending the VET program effective November 1, 2003. On September 10, 2003, in response to all these events, the Kentucky Resources Council gave notice that it intended to file suit demanding compliance with the existing SIP.[4] So far as the Court can determine, Defendants did not reply.

On October 27, 2003, the EPA notified the District that its only option was to disapprove the SIP revision. The EPA offered two basic reasons for its decision: (1) the District could not eliminate the VET without offering compensating control measures to assure continued attainment of one-hour ozone existing standards; and (2) the submission contained no plan for attaining new EPA fine particulate and eight-hour ozone standards. The correspondence stated in no uncertain terms that the District's request to revise the SIP could not be approved. In fact, it concluded by saying that "it is our intent in the next few weeks to prepare an action in the *Federal Register* disapproving the September 23, 2003, SIP submitted revision." Notwithstanding that statement, the EPA has yet to file such a formal denial.

The EPA actually communicated its denial to the Cabinet with a copy to the District. The Cabinet forwarded that correspondence to the District with a cover letter noting that

> This means that the SIP, as codified at 40 CFR 52.920 to 52.939, continues to have full force and effect pursuant to the federal Clean Air Act, 42 U.S.C. § 7401, *et seq.* Louisville/Jefferson County Metro, through the Louisville/Jefferson County Metro Air Pollution Control District, must as a matter of federal law continue implementing its 1–Hour Maintenance Plan, which includes operation of the vehicle emissions testing program.... [W]e wanted to make you aware of the denial, and of the continuing obligation imposed by federal law.

Notwithstanding the EPA's denial of the revision request and the Cabinet's warning about the requirements of federal law, the District determined to proceed with its existing plans to end the VET program. On November 1, 2003, the District ceased to implement and enforce the VET program. On the same day, Plaintiffs filed for relief under the Kentucky Declaratory Judgment Act. Jefferson Circuit Court Judge Thomas B. Wine concluded, however, that he lacked jurisdiction to decide the questions concerning federal law. On November 17, 2003, Plaintiffs filed this federal lawsuit seeking injunctive relief requiring the District to recommence the VET program.

On December 4, 2003, the EPA notified the District that, on April 15, 2004, it intends to formally designate Louisville as being in nonattainment with the eight-hour ozone standard. This letter commences a statutory consultation period between the EPA and the District regarding the proposed designation. On the same date, Metro Louisville Mayor Jerry Abramson named an Air Quality Task Force to develop a long-term strategy to improve our community's air quality.

On November 20, 2003, the Court held a hearing to discuss Plaintiffs' request for an

---

4. The Act has several enforcement mechanisms. One of those is that a citizen may bring suit to enforce compliance with its provisions. 42 U.S.C. § 7604(a)(1). Prior to filing such a lawsuit, a plaintiff must provide at least 60 days' notice to various responsible parties. *Id.* § 7604(b). The purpose of the notice provision is to give a state or local agency warning so it can evaluate and avoid possible unlawful actions, thus saving the expense of a judicially imposed remedy that could include payment of the plaintiff's attorney's fees.

immediate injunction. At that time, the Court noted that the District may have acted prematurely by terminating the VET. The Court concluded, however, that the EPA, the Cabinet, and the District needed additional time to brief the legal issues and to gather relevant technical and environmental evidence. The Court, therefore, scheduled a hearing for two months later. On January 20, 2003, the Court conducted that hearing at which time every party had the chance to introduce any relevant evidence. Only Plaintiffs brought forward witnesses.

## II.

The Clean Air Act allows citizens to file a civil action against any federal, state, or local government entity that is alleged to have violated an emission standard or limitation contained in the Act. 42 U.S.C. § 7604. The Kentucky SIP, which includes the local VET program, is an "emission standard" under the definition contained in the Act. *Id.* § 7604(f). Plaintiffs, therefore have the right to allege violations of the SIP. The Act also specifically authorizes federal district courts to enforce these emission standards. *Id.* § 7604(a)(3).

The central question in this case from which all others devolve is whether the Cabinet, the District, or the EPA has violated the Act. The parties do not dispute that Kentucky's currently approved SIP requires that Jefferson County maintain a VET program. Since an EPA-approved SIP is enforceable as federal law, no one denies that, by terminating the VET, the District violated federal law by eliminating the program. *See Gen. Motors Corp.,* 496 U.S. at 540, 110 S.Ct. 2528.

The District offers two justifications for its actions. The District's first excuse is that it terminated the VET in order to comply with KRS 77.320. In other words, the District is saying that

when confronted with the contradictory commands of Congress and the Kentucky legislature, it must obey the legislature. The difficulty with this view is that the Supremacy Clause of the United States Constitution says that a valid federal law will preempt a conflicting state law. The state law is without effect, at least to the extent of the conflict. U.S. Const. art. VI, cl. 2; *Pac. Gas & Elec. Co. v. Energy Res. Conservation & Dev. Comm'n,* 461 U.S. 190, 103 S.Ct. 1713, 75 L.Ed.2d 752 (1983); *Fid. Fed. Sav. & Loan Ass'n v. de la Cuesta,* 458 U.S. 141, 102 S.Ct. 3014, 73 L.Ed.2d 664 (1982); *Jones v. Rath Packing Co.,* 430 U.S. 519, 97 S.Ct. 1305, 51 L.Ed.2d 604 (1977). Sometimes confusion can arise about whether Congress intended that a federal statute preempt state laws. Here, there is no such confusion. The Act specifically precludes the right of any state to "adopt or enforce any emission standard or limitation which is less stringent than the standard or limitation" contained in the SIP. 42 U.S.C. § 7416. Thus, the Constitution, the Act, and case law are clear that where federal law has spoken, state law may not impose a lesser standard. *See Her Majesty the Queen in Right of the Province of Ontario v. City of Detroit,* 874 F.2d 332 (6th Cir.1989) (stating that the Act displaces state law to the extent that state law is not as strict as limitations set out in the Act). If it does impose a less stringent standard, the federal law prevails.

No one seriously disputes that KRS 77.320 imposes a less stringent standard than the current SIP and the Act. By requiring the termination of the VET, which the EPA approved to ensure attainment of the one-hour ozone standard, the legislature is weakening the existing federal requirement for maintaining existing clean air standards. Moreover, by changing the SIP without EPA approval, the District follows a procedure that is sub-

stantially less rigorous than that set out in 42 U.S.C. § 7410. Defendants failed to present any evidence that Kentucky's SIP is not "less stringent" without the VET program.[5] Consequently, the Court concludes that the Act, both procedurally and substantively, preempts KRS 77.320.

The Kentucky legislature, no matter how well it may intend to reflect the will of some of its constituents, cannot unilaterally change this procedure. "Although it is clear that the Clean Air Act contemplates very significant participation in air pollution control by state air pollution control agencies, it is equally clear that the final authority is vested in the [EPA] and the courts of the United States." *U.S. v. Ford Motor Co.*, 814 F.2d 1099, 1102 (6th Cir. 1987). While the Kentucky statute certainly presents a quandary because the District strove to follow state law, the correct course of action here should not have been in doubt. Federal law controls. *See id.* (stating that absent final authority in EPA, the attainment goals of the Act would prove ephemeral). If the District entertained any doubt, it could have initiated its own declaratory judgment action. Any court would have provided the District with the same answer prior to November 1, 2003 as this Court provides now.

The Court and the District have the benefit of two cases directly on point. *See Clean Air Council v. Mallory*, 226 F.Supp.2d 705 (E.D.Pa.2002); *Sweat v. Hull*, 200 F.Supp.2d 1162 (D.Ariz.2001). While neither are binding for this Court, both contain compelling analyses and both support the Court's conclusion that the Act preempts the state law termination of a federally enforceable SIP without EPA approval. In each case, state laws unilaterally removed the authority of a state agency to implement a vehicle testing program before EPA approved such action. Both courts held these state laws were preempted because the existing maintenance SIPs *were* enforceable as federal law. *See Sweat*, 200 F.Supp.2d at 1172; *see also Clean Air Council*, 226 F.Supp.2d at 718–20.

■ The District's second half-hearted explanation for its calculated breach of federal law is that it can proceed with termination of the VET program now because ultimately the EPA will approve the SIP revision. More specifically, the District argues that the language in the Act and its regulations permit a change to the Kentucky SIP *before* the proposed change is submitted to the EPA for approval. The case law and the applicable regulations thoroughly discredit this suggestion. *See* 40 C.F.R. § 51.104 *et seq.*

Absent any actual case law to support such a view,[6] the District cites a recent situation in Florida. There, the state submitted its SIP revision request to the EPA in December 1999. The Florida legislature, however, terminated all state vehicle testing programs in July 2000 before the EPA had approved the revision. The EPA approved the change in August 2001, over a year after the actual termination of those programs. The District says that the events in Florida show that a state may act prior to receiving EPA approval.

---

**5.** One may legitimately debate whether the VET is cost-effective, overly intrusive, necessary to meet air quality standards, or whether other methods are more desirable. What cannot be disputed, however, is that to eliminate the VET will result in an increase of air pollutants in our local environment and a relative worsening of our ambient air quality. One can argue that those changes are insig-

nificant; however, one cannot say that eliminating the VET has no consequence. Eliminating it imposes a less stringent standard.

**6.** The argument is in fact directly contrary to the Supreme Court and Sixth Circuit pronouncements in *General Motors*, 496 U.S. at 540, 110 S.Ct. 2528, and *Ford Motor Company*, 814 F.2d at 1103.

Citing a "situation" rather than a court decision is unusual and unauthoritative to say the least. The District's argument is akin to suggesting that because one person violates the law, escapes detection, or is excused, then anyone else is entitled to do the same regardless of the circumstances. Whatever happened in Florida is not reliable authority upon which the Court could approve the District's actions here under entirely different circumstances.[7] In any event, the District has presented no evidence that the EPA is likely to approve this SIP revision soon, or ever. Even under unusual circumstances, an approved SIP remains the applicable and enforceable program even after a state has submitted a proposed revision. *See Ford Motor Co.*, 814 F.2d at 1103.

The Court finds as a matter of law that the District's action to terminate the VET program without EPA approval, whether in furtherance of state law or of its own policy, constituted a clear violation of federal law.

### III.

Having concluded that the District's action violates the Act, the Court must next determine whether it may enforce an equitable remedy against any of the Defendants. Plaintiffs do not seek enforcement against the EPA, and neither the District, Arthur Williams, nor Dr. Karen Cassidy raise a defense as to the Court's power to seek enforcement against them. Defendant Lajuana S. Witcher, the newly appointed Secretary of the Kentucky National Resources and Environmental Protection Cabinet (the "Secretary"), however, disclaims specific responsibility for any of these events and seeks to avoid legal liability on the grounds that she is immune from suit under the Eleventh Amendment of the United States Constitution. The Eleventh Amendment prohibits federal courts from hearing suits brought by private citizens against state governments without the state's consent.

■ First, the Court will consider the Secretary's responsibility. The evidence demonstrates that the Cabinet has delegated to the District the power to propose, implement, and maintain that portion of the SIP applicable to Jefferson County. The District decided to terminate the VET program after so advising the Cabinet.[8] Nevertheless, under state law, the Cabinet retains the power to enforce all applicable regulations and standards even where it has delegated some of its authority. KRS 224.20–130. Moreover, under the Act, the Cabinet retains the "primary responsibility for assuring air quality" within the state. 42 U.S.C. § 7407. The Court concludes that the Cabinet cannot evade responsibility merely by delegating its statutory duty to others or advising the District to follow federal law.

■■ Second, the Court will consider whether it may enforce a remedy upon the Secretary. She argues that the Eleventh Amendment bars such action. One recognized exception to the Eleventh Amendment's sovereign immunity is that federal courts may enjoin an individual state officer from violating federal law and may

---

7. In Florida, the EPA actually issued a proposed *approval* of the revision to the Florida SIP. Here, the EPA *disapproved* of the proposed revision. Moreover, neither the EPA nor a citizen group challenged Florida's statute terminating its programs as preempted by federal law. No one questioned whether it was procedurally correct to implement a SIP revision without first getting EPA approval.

8. From Mr. Williams's testimony, the Court concludes that the Cabinet was advised of the District's intended action. The Cabinet reminded the District that it must follow federal law but did not prohibit the District from terminating the VET.

grant a plaintiff prospective relief to stop an ongoing violation of federal law. *See Ex parte Young,* 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908). The Cabinet argues that, although it is generally recognized that a federal court may enjoin a state official from violating federal law, the Secretary has not violated any federal law nor can Plaintiff show the existence of the "requisite connection" between her and the VET program.

The purpose of the sovereign immunity analysis is to determine whether a federal court can actually order prospective injunctive relief that governs that official's future conduct. The purpose of the *Ex parte Young* exception to sovereign immunity is to permit federal courts to enforce federal rights and hold state officials responsible to the supreme authority of the United States, where appropriate. The *Ex parte Young* exception does require an officer to have a direct connection to the act sought to be enforced. "[S]uch officer must have some connection with the enforcement of the act ...," but "[i]t has not ... been held that it was necessary that such a duty should be declared in the same act which is to be enforced.... The fact that the officer by virtue of his office has some connection with the enforcement of the act is the important and material fact, and whether it arises out of the general law, or is specifically created by the act itself, is not material so long as it exists." *See id.* at 157, 28 S.Ct. 441. The Secretary appears to meet that requirement quite easily.

The Secretary has both the specific authority and a specific duty to maintain and administer the approved SIP. This specific duty would contrast, for instance, with the Governor, who has only a general duty as to those laws. The Act allows a state agency, like the Cabinet, to designate a local agency to implement all or a portion of a SIP. 42 U.S.C. § 7410(a)(2). In fact,

the EPA regulations allow for the Cabinet to assign complete responsibility for carrying out a part of the SIP to the District. *See* 40 C.F.R. § 51,232 (Jan. 1, 2004). The Act plainly states, however, that it is primarily the state agency's responsibility to enforce the approved SIP, regardless of delegation to a local agency. 42 U.S.C. § 7407. Kentucky, through the Cabinet and the Secretary, is required to provide assurances that the state is not prohibited, by any provision of federal *or state law,* from carrying out its SIP or *any* portion thereof. *See id.* § 7410(a)(2). The Cabinet may delegate to the District the power to maintain and implement its portion of the SIP. It may not delegate its primary responsibility to ensure compliance with the Act itself.

The Court concludes that the Secretary has a sufficient direct responsibility and connection to the enforcement of the Act to justify the exercise of the Court's jurisdiction.

## IV.

■ Even though the Court has found a clear violation of federal law, the District in essence asks this Court to require something less than full compliance with the SIP. The initial questions that inform the Court's consideration of the appropriate relief are (1) the extent of its powers to grant equitable relief and (2) the applicable standard for determining that relief.

The Act does not set any limitation on the type of relief that the Court may require to enforce a violation. One cannot seriously dispute that an injunction requiring a proper official to comply with federal law is within the Court's discretion. Indeed, the Sixth Circuit long ago suggested that courts may have a certain obligation to ensure enforcement of congressional mandates, irrespective of any balancing of

interests. *See United States v. City of Painesville*, 644 F.2d 1186 (6th Cir.1981).

By its calculated breach of the SIP, the District has violated a central tenet of the Act. To ensure enforcement of the Act's standards and plans in a fair manner should therefore be the Court's foremost concern. Nevertheless, to require affirmative government action is extraordinary relief. Under these circumstances, the Court will consider whether Defendants can articulate any sound reasons for avoiding or delaying enforcement of the Act.

### A.

Even though the Court has found a clear violation of federal law, the District suggests that it is a technical one and, therefore, is not serious enough to warrant an affirmative injunction. For the District to suggest that terminating the VET is only a technical change, or that ignoring the statutory approval process is only a procedural technicality, seems to be a stunning mischaracterization of its action.

For years, the VET has been the centerpiece of this community's fight against ozone pollution. That some people honestly believe that the program has outlived its usefulness cannot mean that those of that view can take matters into their own hands. We are, after all, "a government of laws, and not of men."[9] The Act's procedure approval and revision process is absolutely essential to maintaining national standards for ambient air quality in a cooperative spirit. Without those procedural controls, the Act is bereft of coherence and enforcement power. To ignore the Act's procedural safeguards is more akin to statutory anarchy than a mere technical violation.

The Court finds nothing that detracts from the seriousness of this violation or the statutory requirement of enforcement.

### B.

The District suggests that it is somehow unfair to permit citizen enforcement of the Act where the EPA itself has not sought to remedy the existing violation. The seeming contradiction arises directly from the statutory enforcement scheme itself.

■ Congress crafted three different mechanisms to ensure enforcement of the Act. First, states may sue violators under state or federal law. Second, the EPA may sue, after giving thirty days' notice. 42 U.S.C. § 7413(a)(1). Third, the Act permits citizen suits. *Id.* § 7604(a)(1). The EPA has broad discretion whether to bring an enforcement action, to use available regulatory procedures, or to do nothing, depending upon its available resources and priorities. Generally, a court may not force the EPA to pursue a particular enforcement strategy. *See, e.g., City of Seabrook v. Costle*, 659 F.2d 1371, 1374 (5th Cir.1981).

■ Under the Act, citizen suits serve as a supplement or assurance that the Act will be implemented and enforced. A citizen's right to bring suit to enforce the Act is independent of the government's exercise of its prosecutorial discretion. The only limitations on this remedy is that a citizen must provide sixty days' notice prior to filing and that suit may not proceed where the EPA is diligently pursuing its own enforcement action. 42 U.S.C. § 7604(b). Plaintiffs meet both criteria.

That the EPA has thus far declined to file an enforcement action does not constitute reason for questioning Plaintiffs' in-

---

**9.** John Adams, *Novanglus Papers*, Boston Gazette, 1774, no. 7 (incorporated into Mass. Const., art. 30, Declaration of Rights).

dependent right to do so. Nor does it redistribute the equities somehow in the District's favor.

### C.

An important consideration in deciding whether to grant any equitable relief is whether the mandated relief itself causes more unfair collateral consequences.

The District is on record as believing that elimination of the VET program would do significant environmental, health, and economic damage to our community. The Court need not quantify the degree of that harm. To his credit, Mr. Williams did not disavow the statements and opinions contained in his March 26, 2002 letter to Governor Paul Patton. Significantly, none of the Defendants has introduced any evidence to disprove Mr. Williams's conclusions. The Court can only conclude that, based on Mr. Williams's testimony, elimination of the VET may be harmful to ambient air quality as well as in other collateral areas.

To require re-establishment of the VET could itself impose an unfair burden. One such burden is the expense and inconvenience to individual citizens. The Court would only restore a program that has existed for twenty years. As with any program that offers a benefit to the community at large, we individual citizens must surrender a small measure of ourselves—a few dollars and a little inconvenience—to acquire a collective benefit—better ambient air quality. The District introduced no evidence that the VET's burden upon individual citizens or upon the community as a whole was substantial.

Another burden is the governmental costs in re-establishing the VET. To restart the VET may require considerable expense and effort on the District's part. The District, however, has introduced no evidence to suggest that the expense will be unduly burdensome. On the contrary, Mr. Williams and others testified that, given a reasonable time, the District could restart the VET program without great difficulty. Moreover, the District is in no position to cry foul. After all, its own miscalculation has occasioned the need for this extraordinary relief. In any event, the Court could account for a reasonable timetable in fashioning a more specific remedy.

### D.

The District's other complaints focus on an unfairness with the EPA's regulatory process. The District says that to require reinstatement of the VET is both unfair and unnecessary because (1) the District has met the one-hour ozone ambient air quality standard; and (2) it is unfair to apply the new higher ozone standards. Finally, the District says that the EPA has failed to fulfill its responsibilities to approve or disapprove the SIP revision in a timely fashion.

Only the first premise is correct. Attainment of an existing standard, however, does not permit the District unilaterally to ignore federal law. In fact, the District proposed and EPA approved the current SIP expressly to *maintain* the current attainment. The second premise is incorrect. The Supreme Court and the District of Columbia Circuit Court of Appeals have recently upheld the EPA's latest national ambient air quality standards. *See Whitman*, 531 U.S. at 457, 121 S.Ct. 903; *Am. Trucking Ass'ns, Inc. v. EPA*, 283 F.3d 355 (D.C.Cir.2002). The Court has carefully reviewed those decisions as well as the EPA's final rule revising the national ambient air quality standards. 62 Fed. Reg. 38,856 (Jul. 18, 1997) (to be codified at 40 C.F.R. pt. 50). The rule suggests that the EPA will prepare policies for gradual implementation of the new air

quality rules in "the most efficient and environmentally effective manner." 61 Fed.Reg. 65,716 (Dec. 13, 1996) (to be codified at 40 C.F.R. pt. 50). These comments as well as the recent holdings of the Supreme Court suggest the EPA could be well within its discretion to apply the new eight-hour ozone and fine particulate standards to the Kentucky SIP. Importantly, the Court finds no authority for the view that the EPA exceeds its power by stating that the new standards will apply.

Finally, the District cannot complain because the EPA has failed to act on its requests. After the District submitted its SIP revision, the EPA responded that it would likely not approve it. It told the District to expect a formal denial within a few weeks. The EPA has never submitted a formal denial. Although the EPA could act sooner pending completed review of the submittal, pursuant to the Act and its regulations, the EPA has until sometime in early 2005 to take final action on the SIP revision. A determination by the EPA approving or disapproving a proposed SIP revision is discretionary. Therefore, a district court may not compel the EPA to approve a revision. See Dow Chem. Co. v. Costle, 480 F.Supp. 315 (E.D.Mich.1978). After the EPA denies a request, the state's appeal is to a United States Circuit Court of Appeals. 42 U.S.C. § 7607(b). This places the District in a precarious position. Though the EPA has indicated it will deny the proposed revisions, without a formal denial, the District has no right to appeal.

The Court can request that the EPA provide an appealable order, but it has no power to require one. By providing a clear and appealable answer, the EPA could help promote a more than adequate remedy that could be fairer and clearer to all concerned. None of this, however, changes the wrongfulness of the District's unilateral action and Plaintiff's entitlement to equitable relief.

### E.

A final and important consideration is whether the public interest would be served by the imposition of equitable relief to restore the status quo. The District altered the lawful status quo by terminating the VET program. Such an action does a disservice to all of the other citizens who expect us to follow applicable laws and procedures.

The public interest is served most directly by upholding the legal procedures that Congress established. The legislature's attempt to override the Act and the District's bowing to a clearly unlawful command harms that interest. The Court is left merely to gather and reassemble the scattered pieces. The Court does not claim the right to decide whether the VET program is good environmental policy for this community. The Court has neither the authority to begin such an inquiry nor the evidence from which it could reach any valid conclusions. Equally clear, however, is that the District does not possess the unilateral right to make that decision either. The only fair resolution is to return the participants to their lawful positions so that these important issues can be resolved in accordance with proper procedures under the Act.

### V.

The Court has concluded that the District violated the Clean Air Act by terminating the VET program without the EPA's prior approval. Plaintiffs asked the Court to impose injunctive relief that requires the District to reinstate the VET program. The Court has naturally hesitated before asking duly appointed officials to take affirmative action requiring some degree of expense and trouble. Moreover, the Act is intended to encourage important air quality decisions to be made through a deliberative and cooperative process

among the EPA, the Cabinet, and the District. The Act sought to prohibit unilateral decisions by state or local agencies. Only as a last resort did it envision courts having to enforce specific actions. Unless the parties begin cooperating, we have come to that last resort.

The field of clean air management involves many complex scientific, environmental, economic, and regulatory considerations. The complexity and contentiousness surrounding many of these issues makes it difficult for the EPA always to provide timely advice and even more difficult sometimes for states to follow it. That is why the EPA's ongoing and extremely deliberative regulatory and review processes can stretch over many years. Once again, this explains why courts should be careful about intruding on the process, except where absolutely necessary. Unfortunately, this appears to be such a circumstance.

The District's latest pleading argues that on January 5, 2004, the EPA issued a proposed rule that would permit termination of the VET. 69 Fed.Reg. 302 (Jan. 5, 2004) (to be codified at 40 C.F.R. pt. 52). No one disputes that the EPA possesses the authority under the Act to issue such permission. The Court has carefully reviewed the proposed rule. It proposes a revision to the year 2012 motor vehicle emission budgets using Mobile 6 for Louisville's one-hour ozone maintenance area. This appears to concern a different subject than the EPA's 2001 final rule by which the District committed to continue all its existing enforcement programs, including the VET. 66 Fed.Reg. 53,665 (Oct. 23, 2001) (to be codified at 40 C.F.R. pts. 52 & 81). By the Court's reading, this proposed rule does not revise the current SIP enforcement requirements, which include a commitment to the VET. If the latest proposed rule actually does revise the SIP to allow removal of the VET, then the District is certainly free to do so. This Court would have much less to ponder. At the very least, however, that is not clear. The Court will ask the EPA to file a response providing its own interpretation of the recent proposed rule.

Over the last week the Court has reviewed all the relevant equitable considerations and has found no reason to delay enforcement of this very clear federal statute. The Court concludes that an affirmative injunction is necessary and appropriate to uphold the Act's mandates. None of Defendants has interposed valid reasons to justify the VET termination or to excuse enforcement of the Act. Before determining a schedule for the proposed relief, the Court will need a response from the District, as well as various responses from the EPA and counsel for Plaintiffs, all of which the Court must review before fashioning the final order for relief.

The Court will enter an order consistent with this Memorandum Opinion.

### ORDER

Plaintiffs have moved for equitable relief to require the District to re-establish the Jefferson County's Vehicle Emission Testing ("VET") program. Various parties have moved to dismiss. The Court has issued a Memorandum Opinion setting forth its view of the law and equitable considerations. Being otherwise sufficiently advised,

IT IS HEREBY ORDERED that

a. Plaintiff's motion for permanent injunction is SUSTAINED to the extent that the District has violated the Clean Air Act and is entitled to an equitable remedy requiring that the District restart the VET program.

b. The equitable remedy provided herein is subject to amendment by a subsequent proposed rule of the EPA changing the Kentucky SIP; and

c. Imposition of the precise and final remedy is STAYED pending the Court's review of subsequent filings.

IT IS FURTHER ORDERED that on or before **March 1, 2004,** the District shall file with the Court an integrated proposal for re-establishment of the VET program. The proposal shall assure and including the following:

a. A schedule of work and activity from any governmental entity whose assistance is necessary to operate the VET program.

b. A description of all costs and proposed fees assuming a four-year period operation.

c. All schedules and costs should assume that an order to resume the VET shall be issued no sooner than April 1, 2004, with actual resumption of the VET to occur at the earliest reasonable time thereafter based on the schedules provided.

d. The schedules and costs shall assume that the District can negotiate directly with the previous contractor for operation of the VET.

IT IS FURTHER REQUESTED that on or before **March 1, 2004,** EPA shall file (1) either a formal response to the District's request for revision of the SIP or notice of a time frame within which it might do so, and (2) a memorandum setting forth its position as to whether its proposed order issued at 69 Fed.Reg. 302 (Jan. 5, 2004) constitutes approval for the District to terminate the VET. Any other party may file a memorandum also as to the second issue.

IT IS FURTHER ORDERED that on or before **March 1, 2004,** Plaintiffs shall submit a motion for their attorney's fees and costs.

IT IS FURTHER ORDERED that the motions to dismiss filed by the District and the Cabinet are DENIED.

IT IS FURTHER ORDERED that a hearing is set for March 8, 2004, at 10:00 A.M. to hear argument concerning the exact scope and timetable for the injunctive relief.

This is not a final order.